**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____X

**T.H. and E.H.** individually, and on behalf of their
child, **R.H.**, a minor,

Plaintiffs,

     -against-

**West Hempstead Union Free School District**

Defendant.
_____X

**Case No. 2:25 cv 150**

**COMPLAINT FOR**
**ADMINISTRATIVE REVIEW**
**OF ERRONEOUS STATE**
**REVIEW OFFICER DECISION**

Individuals with Disabilities
Education Act; N.Y. Educ. Law §4401
_et seq_.

Plaintiffs, T.H. and E.H. (Parents), individually and on behalf of their minor child, R.H.,

allege the following against Defendant, West Hempstead Union Free School District (District):

**I.**     **PARTIES**

1.     R.H. is a twelve-year-old "child with a disability" as defined by Individuals with

Disabilities Education Act (IDEA).

2.     Parents and R.H. have resided at all relevant times within the geographical area

served by the District.

3.     The District is the Local Educational Agency (LEA) responsible for providing R.H.

a FAPE under the IDEA and New York's education laws and administrative code.

4.     The District's administrative offices are located at 400 Nassau Boulevard, West

Hempstead, NY 11552.

**II.**     **JURISDICTION AND VENUE**

5.     The Court has subject matter jurisdiction over this action under the IDEA, 20

U.S.C. § 1400, _et seq._, and 28 U.S.C. § 1331, which confers jurisdiction in cases arising under the

Constitution and laws of the United States.

6.      The Court has supplemental jurisdiction to adjudicate New York state law claims arising out of the same facts as in the asserted federal claims. 28 U.S.C. § 1367.

7.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(l) as the District has its principal offices in this judicial district.

8.      Plaintiffs have exhausted their administrative remedies for all claims that require exhaustion.

## III.    LEGAL FRAMEWORK AND STANDARD OF REVIEW

### A.  The Individual with Disabilities Education Act (IDEA)

9.      This is an action under the IDEA, which offers states federal funding in exchange for their agreement to provide students with disabilities a "free appropriate public education" (FAPE).

10.    The Supreme Court has explained:

> FAPE, as the [IDEA] defines it, includes "special education" and "related services." "Special education" is "specially designed instruction . . . to meet the unique needs of a child with a disability"; "related services" are the support services "required to assist a child . . . to benefit from" that instruction.

> A State covered by the IDEA must provide a disabled child with such special education and related services "in conformity with the [child's] individualized education program," or IEP.

*Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 390-91 (2017).

11.    The *Endrew F.* court further explained the IEP is the "centerpiece" of the IDEA's "education delivery system for disabled children." *Id*. at 391. The crux of the Court's decision was that an IEP must be tailored to the child's individual circumstances and unique needs, explaining:

> A comprehensive plan prepared by a child's "IEP Team"[1] which includes teachers, school officials, and the child's parents, an IEP must be drafted in compliance with a detailed set of procedures.

---

[1]In New York, the IEP Team is called the Committee on Special Education (CSE).

These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances. The IEP is the means by which special education and related services are "tailored to the unique needs" of a particular child.

*Id*.

12.     The Court then explained that an IEP *requires* fulsome, accurate information about the disabled child, and must articulate a detailed plan that, if followed properly, will give the child the best chance at making real and meaningful progress. It emphasized the "individualized" nature of IEPs: "An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id*. at 400.

13.     The specific factual context for the Court's decision was that the child, Endrew, was making only "small advances or alterations" in his public school from year to year, not meaningful progress. *Endrew F. v. Douglas Cty. Sch. Dist*., 290 F. Supp. 3d 1175, 1185 (D. Colo. 2018) (district court opinion on remand from Supreme Court).  The district court and 10th Circuit had held that Endrew's progress, while minimal, was sufficient to satisfy the Supreme Court's then-existing standard for FAPE under *Board of Education v. Rowley*, 458 U.S. 176 (1982), which merely required a child to make "more than *de minimis*" progress. *Endrew F., 580 U.S. at 397-403*.

14.     Revisiting and rejecting this formulation, *Endrew F*. raised the substantive "floor" for FAPE, establishing the "markedly more demanding" standard that an IEP be "appropriately ambitious in light of [the child's] circumstances." *Id*. at 402.

15.     On remand, the district court held that Endrew's IEP did not meet the Supreme Court's revisited substantive floor for FAPE because it –

failed to create an educational plan that was reasonably calculated to enable Petitioner to make progress, even in light of his unique circumstances. The IEP was not appropriately ambitious because it did not give Petitioner the chance to meet challenging objectives under his particular circumstances. Specifically, the IEP

proposed by the District was not reasonably calculated for Petitioner to "achieve academic success, attain self-sufficiency, and contribute to society that are substantially equal to the opportunities afforded children without disabilities."

*Endrew F.*, 290 F. Supp. 3d at 1186.

16.     *Endrew F.* is a crucial comparison in this case because, as discussed below, R.H. similarly made almost no progress from year to year under the IEPs offered by the District. Moreover, like Endrew's IEPs, R.H.'s IEPs lacked formal behavior plans despite clear indications that she needed them.  In language that applies with equal force to this case, the *Endrew F.* district court explained:

> The District's inability to develop a formal plan or properly address Plaintiff's behaviors that had clearly disrupted his access to educational progress starting in his second grade year does, under the new standard articulated by the Supreme Court in this case, impact the assessment of whether the educational program it offered to Petitioner was or was not reasonably calculated to enable him to make progress appropriate in light of his circumstances. The District's inability to properly address Petitioner's behaviors that, in turn, negatively impacted his ability to make progress on his educational and functional goals, also cuts against the reasonableness of the April 2010 IEP.

*Id.* at 1184.

17.     The Supreme Court's restatement of the FAPE standard is consistent with Congress's findings in 2004 when it enacted a major revision of the IDEA:

> [T]he implementation of this title has been impeded by ***low expectations***, and an insufficient focus on applying replicable research on ***proven methods of teaching and learning*** for children with disabilities.

> Almost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by—

> (A) having high expectations for such children and ensuring their access to the general education curriculum in the regular classroom, to the maximum extent possible, in order to—

> (i) meet developmental goals and, to the ***maximum extent possible***, the challenging expectations that have been established for all children; and

(ii) be prepared to lead ***productive and independent*** adult lives, to the ***maximum extent possible***;

20 U.S.C. § 1400 (emphases added).

18.     When a parent believes their child has not received a FAPE, they have the right to a "Due Process" hearing before an impartial hearing officer (IHO).  This is a bench trial for all intents and purposes.

19.     Among the many procedural protections in Due Process hearings, Parents and school districts have the right to introduce records and to call and cross-examine witnesses.

20.     The *Endrew F.* court emphasized that, by the time of a Due Process hearing, a district should "be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Id.* at 404. This expectation of a "cogent and responsive explanation" is heightened in New York, where school districts have the affirmative burden to prove that they offered a child a FAPE.

21.     At the conclusion of a Due Process hearing, an IHO issues a "findings of fact and decision" (FOFD). IHOs and reviewing courts have broad power "in considering equitable factors relevant to fashioning relief." *Gagliardo v. Arlington Cen. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007).

### B.  Review of New York SRO decisions: Federal courts only defer to the SRO for certain categories of analysis.

22.     New York has a "two-tiered" Due Process system. After an IHO issues an FOFD, an aggrieved party may seek review before a State Review Officer (SRO) in the New York Office of State Review.

23.     The SRO is charged with making an independent decision based on its review of the entire record. The SRO operates like an appellate court in that it seldom admits additional

evidence and almost never hears live testimony. Unlike state and federal appellate panels, SROs act individually and do not request oral argument.[2]

24.    A party aggrieved by the SRO's decision may then file an original action challenging that decision in state trial court or federal district court.[3]

25.    A district court performs an independent judicial review of the SRO's decision and makes its decision based on the preponderance of the evidence. *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012).

26.    Because the SRO is New York's final state administrative decisionmaker, federal courts owe some deference to its decisions. However, because SROs are appellate officers who, unlike IHOs, review a "cold record" without observing witness testimony, the deference courts owe to them is circumscribed. Courts have explained that deference to the SRO hinges on the *quality* of its opinion and applies only to specific categories of analysis. A reviewing court's deference to an SRO decision "will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive." *Id*. at 244 (internal citations omitted).

27.    Different aspects of an SRO's analysis merit greater and lesser deference from reviewing courts:[4]

- Little deference to the SRO when it interprets objective indications of progress.

- Little deference to the SRO when it challenges the IHO's findings by relying on documents that lack foundation or testimonial corroboration.

- More deference to the SRO when it has greater familiarity with the evidence and witnesses than does the reviewing court.

---

[2] SROs are authorized to hear oral argument and testimony but in practice seldom do so.
[3] The IDEA gives concurrent jurisdiction to state and federal courts to review IHO and SRO decisions. As a practical matter, parties typically file such actions in federal court.
[4] *See, e.g., id.*; *Scott v. N.Y.C. Dep't of Educ.*, 6 F. Supp. 3d 424, 444 (S.D.N.Y. 2014); *K.R. v. N.Y.C. Dep't of Educ.*, 107 F. Supp. 3d 295, 308-09 (S.D.N.Y. 2015); *C.L. v. N.Y. City Dep't of Educ.*, 12 Civ. 1676 (JSR), 2013 U.S. Dist. LEXIS 3474 (S.D.N.Y. Jan. 3, 2013).

- More deference to the SRO when it makes decisions about an IEP's educational methodology and substantive adequacy.

- No deference to the SRO when it substitutes its assessments of credibility for those of the IHO.

- No deference to the SRO when it decides whether a district has complied with the IDEA's procedural requirements.

- No deference to the SRO when it fails to grapple with evidence that contradicts its own findings of fact.

28.    During appeals to the SRO, a school district retains the burden to prove that it offered a child FAPE. The SRO may not reverse that burden and require parents to prove that the district's program or placement was inadequate. *B.R. v. N.Y.C. Dep't of Educ.*, 910 F. Supp. 2d 670, 678 (S.D.N.Y. 2012).

29.    As discussed below, applying this review framework, the Court owes the SRO's decision here little deference. The decision was not "grounded in thorough and logical reasoning," and its grounds for reversing the IHO lay in categories of analysis that do not merit deference.

## IV.    THE IHO'S AND SRO'S CONFLICTING DECISIONS

30.    Applying the correct *Endrew F.* standard, the IHO here held, *inter alia*, that the District: (1) failed to evaluate R.H. properly in all areas of her disability; (2) failed to establish accurate "present levels of performance" for her; (3) failed to write appropriately ambitious goals for her; and (4) failed to offer educational programming and related services specifically designed for R.H. to make progress appropriate in light of her circumstances. *See* IHO Op., *passim*.

31.    The SRO rejected each aspect of the IHO's decision, attached here as Ex. C. But, as explained below, his decision, attached here as Ex. D, is entitled to little deference because, ultimately and among other things, he failed to hold the District to the heightened *Endrew F.* FAPE standard. His decision, in effect, ratifies a vague, unambitious, and all-around-ill-designed program that let R.H. languish for years and kept her parents largely in the dark on her progress.

32.    The following allegations are organized into the following sections: **Evaluative Information, Reading, Goals, Behavioral Interventions, and Vision Services**. Each section explains why the IHO reached a correct decision and why the SRO erred in reversing her. In each domain, the IHO's decision rested on clear documentary evidence corroborated by credible lay and expert testimony. By contrast, in each area, the SRO overstepped his institutional role by overruling the IHO's credibility assessments (either explicitly or implicitly) and by disregarding, mischaracterizing, and selectively citing the evidence in the record.

## EVALUATIVE INFORMATION

### A.  The IHO correctly held that the District never obtained complete, accurate evaluative information about R.H.'s disabilities.

33.    A CSE must have a complete picture of a student, including complete, accurate evaluative information, to design an appropriate IEP.  The Second Circuit has made clear what information the CSE must use to develop an IEP, emphasizing that the district has the burden to show *how* it incorporated current information into the child's IEP:

> [B]oth the [IDEA] and its implementing regulations *require* a CSE, in developing a child's IEP, to consider the most recent evaluative data of the child.…
>
> The purpose of the requirement is to ensure that a CSE, in formulating a student's IEP, provides the student with services narrowly tailored to his or her particular educational needs based on actual and recent evaluative data from the student's education providers, so that the developed IEP will reasonably enable the child to receive the educational benefits to which he or she is entitled by law.
>
> Where, as here, however, the CSE failed to memorialize how it reached the terms of the IEPs, reviewing authorities and courts are left to speculate many months, or as in this case, many years, later as to how the CSE reached the terms of the child's IEP (*i.e.*, which, if any, evaluative materials the CSE actually considered). The resulting implication of this procedural violation is that it provides the reviewing authority with almost unfettered discretion, as it combs through the evaluative materials generated at the time the IEP was formulated, to match terms of the IEP to any assertion contained in any existing document, irrespective of whether it was actually viewed and considered by the CSE or even in possession of the CSE at the time of the meeting.

*L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 110 (2d Cir. 2016) (statutory citations omitted).

34.     A CSE must also ensure that a student is appropriately assessed in all areas related to the suspected disability, including, where appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, vocational skills, communicative status and motor abilities. 20 USC § 1414(b)(3)(B); 34 CFR § 300.304(c)(4); 8 NYCRR § 200.4(b)(6)(vii). An evaluation of a student must be sufficiently comprehensive to identify *all* of the student's special education and related services needs, whether or not commonly linked to the disability category in which he or she has been classified. 34 CFR § 300.304(c)(6); 8 NYCRR § 200.4(b)(6)(ix).

35.     Here, consistent with the Second Circuit's decision in *L.O.* and the above rules, the IHO correctly held that the District failed to obtain complete and accurate evaluative data, and then relied on erroneous information to develop R.H.'s IEPs. *See* IHO Op. at 8-10, 24-25.

36.     The IHO highlighted a series of material errors and omissions by the District, including: failing to administer a functional behavioral assessment (FBA), misclassifying R.H.'s eligibility category, omitting references to her Physical Therapy (PT) evaluation and Social History narrative, making multiple inexplicable typographical errors that significantly inflated R.H.'s reported abilities, and impliedly holding that despite evidence of vision-related struggle, the District failed to evaluate that obvious area of need. *Id*. All of these errors and others – which minimized the scope and severity of R.H.'s academic and functional needs – contributed to the District's years of inadequate programming (discussed more fully below).

37.     The District also relied on inaccurate curriculum-based measures of R.H.'s progress (*i.e.*, informal classroom assessments as opposed to standardized, nationally normed tests) and wrote vague unmeasurable goals. Numerous District witnesses conceded that they did not provide

accurate baseline measurements of R.H.'s performance, failed to track her progress rigorously, and based their progress reports on anecdotal observations rather than actual data, all in contravention of 8 NYCRR § 200.4(b)(6) as well as other regulations and best practice.

38.     These problems compounded and drove the inappropriateness of R.H.'s IEPs. There was no way the District could write accurate, appropriately ambitious goals for R.H. or design an appropriate, evidence-based program for her, without having complete and accurate measurements of her abilities and areas of need.

**B. The SRO erroneously excused the District's failure to generate complete, accurate evaluative information and present levels of performance.**

39.     Rejecting the IHO's holding that the District failed to obtain complete, accurate evaluative information and present levels of performance for R.H., the SRO offered excuses for the District that find no support in the record. To find that the CSE relied on adequate evaluative information in May 2021 and May 2022, for instance, the SRO listed several sources of information, SRO Op. at 14-17, but he omitted that documentary and testimonial evidence undermined almost every source he cited. As noted above, the Court owes little deference to the SRO's interpretation of objective indications of progress.

40.     For example, the SRO cited a February 2021 third grade teacher progress report purporting to show that R.H. had progressed in several areas of reading.  SRO Op. at 14. It reported that she improved in "guided reading" from level C to E between September 2020 and January 2021.  *Id*.  However, the SRO ignored that, as R.H.'s third grade teacher Ms. Moore explained, "guided reading" was not an activity that lent itself to rigorous assessment of reading; rather, it was a group activity where children relied on pictures to support their reading comprehension.  Tr. at 53:21-54:11.

41.     The SRO also substituted his own credibility findings when he disregarded explicit and implicit credibility findings by the IHO. The Court owes no deference to the SRO's credibility findings. For example, the SRO ignored expert Dr. Erin McDonough's credible testimony explaining that guided reading is not an appropriate method for assessing R.H.'s progress or skill. Tr. at 1610-12.  He also noted that the same February 2021 progress report (discussed above) showed R.H. improving in sight-word reading from 43 to 65 words. *Id*. But he ignored that Ms. Moore conceded having no data that would support this claim. Tr. at 191:21-192:5. Finally, any claim that R.H. progressed in reading during the 2020-2021 school year was belied by her struggle to read a level D text in the fall of 2021 (as discussed below).  The February 2021 report was not a valid or reliable source from which the CSE (or SRO) could assess R.H.'s academic levels.

42.     The SRO then cited several sources to support his finding that the CSE had sufficient information as of May 2022, but again ignored the undisputed facts that undermined these sources.  For example, fourth grade teacher Ms. Reetz conceded that she did not like using numerical measures on report cards and that she told parents to focus on the details in her written comments. Tr. at 777. However, Reetz's report card's written comments were minimal and shed little light on R.H.'s progress or lack thereof. Ex. 25. Again, the Court need not defer at all to the SRO's interpretations of objective progress data.

43.     The SRO cited a non-descript, conclusory progress report from the 2021-22 school year purporting to show that R.H. advanced from "progressing gradually" to making "satisfactory progress" towards her reading decoding goal. SRO Op. at 29 (citing Ex. 23).  However, he ignored the actual data sheet corresponding to this report, which, to the extent it tracked the required progress data at all, shows that R.H.'s scores in decoding remained stagnant all year. Ex. 32.

44.    With respect to R.H.'s sight word goal for 2021-22, the SRO credited the same progress report's statement that R.H. was "progressing satisfactorily" by the end of the school year. SRO Op. at 29 (citing Ex. 23).  However, he again ignored the actual data sheet, which *Ms. Reetz left completely blank for this goal*. Ex. 32 at 1. In other words, far from meeting its burden of proof, the District introduced no data to corroborate its report that R.H. was "progressing satisfactorily."

45.    Perhaps most egregiously, the SRO cited a two-sentence, uncredited report in R.H.'s May 2022 IEP about "Wilson"[5] to find that R.H. "was becoming more consistent in using skills taught." SRO Op. at 29-30 (citing Ex. 5 at 1). He ignored the IHO's correct finding that the District failed to produce any actual Wilson data to support this claim. IHO Op. at 16. The District had every reason to produce its Wilson data given that the Due Process Complaint alleged that the District failed to offer Wilson reading with fidelity. *See* DPC ¶¶ 59, 66, 67, 95.

46.    Moreover, the Wilson program covers dozens of reading skills, taught in a highly specific sequence, which teachers must report in detail based on charts completed daily. To report that R.H. was becoming "more consistent in skills taught" within the Wilson program is no more useful than reporting that an aspiring piano player has learned to read a few notes; it offers no guidance for another teacher (or Parent) trying to pick up where the last teacher left off. Moreover, the SRO completely failed to acknowledge let alone grapple with Dr. McDonough's unrebutted testimony that Wilson was not even appropriate for R.H. given her unique disability profile.

47.    As discussed more fully below, and as the IHO held, the CSE's failure to obtain complete and accurate information about and present levels for R.H. led it to offer her inadequate programming, resulting in her making no meaningful progress.  Moreover, she found that, in May of 2021 and May of 2022, the District *deliberately inflated* R.H.'s reading scores by administering

---

[5] Wilson refers to the Wilson Reading System, a commercial program that school districts employ to teach reading to children with dyslexia and other language-based learning disabilities.

multiple "running records" assessments in close succession – a particularly damning credibility finding. The Court owes no deference to the SRO's factual conclusions where it was misinterpreting objective measures of performance, disregarding the IHO's credibility determinations, and declining to grapple with evidence that contradicted and undermined its own findings.

48.    Put simply, the SRO's finding that the District had complete and accurate evaluative information and present levels does not hold up against a careful examination of the full record, which the family deserves.

**READING**

**C.  The IHO correctly held that the District did not prove that it offered R.H. an appropriate reading program or prove that she made progress in reading.**

49.    The IHO correctly held that the District did not offer R.H. an appropriate reading program and that, as a result, R.H. made little progress in reading.  IHO Op. at 15-16.  Her holding is supported by both objective documentary evidence and unequivocal testimony the credibility of which she explicitly and implicitly endorsed. Moreover, her decision correctly assigned the District the burden of proving that it had offered an appropriate program and that R.H. did make progress. The SRO had no basis to reject her factual conclusions or analysis.

50.    As noted above, the IHO correctly found that while the District claimed it used elements of the Wilson program for R.H., it produced nothing to prove that claim. IHO Op. at 16. This fact is uncontested.

51.    She further found that, despite R.H. having struggled in reading for years, the CSE never proved that it reached a consensus on what reading strategies were and were not working for her. Quoting New York state guidance (and long-standing federal case law), she held that the District neglected its duty to "avoid reinstituting programs that have not proven" effective.

52.    The IHO also correctly held that, while a district need not specify in an IEP what methodology it will use, whatever program it does choose must be appropriately tailored to the individual child's needs. During the Due Process hearing, the District failed to prove that it used any appropriate reading program for R.H. The IHO thus concluded: "The District did not offer an individualized and specialized reading program." *Id*. at 16.

53.    The record bolsters the IHO's conclusion.  R.H.'s IEPs did not specify the daily frequency or duration of reading instruction, and they placed R.H. in too large a class for her to receive appropriately intensive instruction. In fact, R.H.'s teacher flatly admitted that R.H. needed more help than she could provide. The District also failed to prove that it placed R.H. in an appropriate peer grouping or that it understood the level of intensity in instruction that R.H. clearly required.

54.    Rather than provide R.H. with an intensive, daily, evidence-based, sequential, multisensory reading program appropriate in light of her individual circumstances, the District offered her disorganized, discredited, eclectic, building-level supports that clearly prevented it from properly tracking her progress and needs.

55.    The District's failure to offer R.H. an appropriate reading program had a predictable outcome: She never learned to read.

56.    In September of second grade (2019-20 school year), R.H. was purportedly reading at Fountas & Pinnell (F&P) level A, which according to F&P, students should master in the fall of *first* grade. Below is a portion of R.H.'s September 12, 2019 F&P "running records" form:



57.     As the form shows, R.H. could not consistently read "we," "dance," and "swing."

Pages 4 and 5 of this Level A reader, *Best Friends*, appeared as follows:



58.     On the above form, R.H. read the word "dance" as "ballet." This error shows that

she guessed "ballet" based on the photo of two girls in ballet poses, rather than reading "We like

to dance" on the opposing page. And although every page in *Best Friends* began with "We like

to," R.H. read the word "We" as "I," showing that she was not distinguishing written symbols.

59.    The F&P system itself (also known as leveled literacy or LLI) is a discredited method of measuring a child's reading. As District witness Moore even conceded (Tr. 162) "Running records" assessments are highly subjective curriculum-based assessments that are not based on national norms. Dr. McDonough gave unrebutted, credible testimony that the LLI / F&P regime is "not evidence based and [has been] debunked." Dr. McDonough's opinion is well accepted and was even echoed by Ms. Moore on cross examination. In September 2023, in a widely reported scandal, the Columbia University Teacher's College Reading and Writing Program, which had advanced this method for teaching reading to thousands of aspiring teachers over several decades, was abruptly "dissolved" by the university after its invalidity was exposed. *See. e.g.,* https://www.tc.columbia.edu/articles/2023/september/advancing-literacy-through-teachers-college-programs-research-and-partnerships/?mibextid=Zxz2cZ (visited Jan. 4, 2025).

60.    By the end of third grade (2020-21 school year), R.H. was purportedly reading at F&P Level F, the expected level for fall of *first grade* – and was therefore nearly three years behind her peers. Her minimal reading skill was a "red flag" that she needed far more intensive, systematic, evidence-based instruction and careful examination of what did or did not work.

61.    Despite her reading several years below grade level, albeit per a debunked and inappropriate assessment method, R.H.'s first quarter report card for 2020-21 made the grossly inaccurate statement that she was "approaching standards" in 9 out of 10 measures of reading, including: "Knows and applies grade level decoding skills" and "reads with accuracy, fluency, and stamina to support comprehension within grade level band."  Ex. D-24-2. As discussed below, this obvious discrepancy supports the IHO's express credibility finding that the District's records lack integrity.

62.    At the end of third grade (2020-21), R.H. was reportedly reading at F&P Level G. However, at the start of fourth grade (2021-22), R.H.'s teacher saw immediately that she could not read Level F or G texts and started her back at Level D (kindergarten level). Below is a page from the Level D reader, *The Nice Little House*, on which R.H. was assessed in the fall of fourth grade:



63.    The teacher's instructions for administering the assessment are as follows:



64.    Below is R.H.'s September 22, 2021 assessment for this page (Ex. D-31):

65.    Although on every page of this book, **entitled *The Nice Little House***, a character enters and says: "What a nice little house!," R.H. read that line as "When a new little house."

66.    The last page of *The Nice Little House* (page 8) has the following image:



67.     Below is the relevant portion of R.H.'s running records assessment form (Ex D-31):



68.     Despite seeing "What a nice little house" repeatedly throughout the book, R.H. read "What a nice big house!" as "Went a nice little house." She was in fourth grade. According to the District and the SRO, she was approaching standards.

69.     By way of comparison, New York's State Department of Education reading standards provide that a child should have obtained the following foundational skills at the end of *second grade*:

**Phonics and Word Recognition**

2RF3:   Know and apply phonics and word analysis skills in decoding words.
2RF3a:  Distinguish long and short vowels when reading regularly spelled one-syllable words (including common vowel teams).
2RF3b:  Decode short and long vowel sounds in two-syllable words.
2RF3c:  Decode regularly spelled two-syllable words.
2RF3d:  Recognize and identify root words and common suffixes and prefixes.
2RF3e:  Read all common high-frequency words by sight.

**Fluency**

2RF4:    Read grade-level text with sufficient accuracy and fluency to support comprehension.

2RF4a:  Read grade-level text orally with accuracy, appropriate rate, and expression on successive readings.

2RF4b:  Use context to confirm or self-correct word recognition and understanding, rereading as necessary.

70.    The District's progress reports consistently concealed the severity of R.H.'s reading deficit from Parents.  Her third grade reading goal was: "[R.H.] will apply decoding strategies when decoding unknown words." Ex. D-22. According to the District's written report, she "achieved" that goal – itself fatally vague – by the end of third grade. This report was plainly wrong.

71.    The District's November 2021 progress report for R.H.'s decoding goal absurdly reported (recall, she could not read the phrase *what a nice little house*) that R.H. was "Progressing Gradually – The student is making less than anticipated progress but may still achieve the goal."

72.    By the end of fourth grade, according to District records, R.H. was purportedly (again) reading where she had reportedly ended third grade, at "Instructional" Level G, which students are expected to reach at the middle of first grade according to F&P.

73.    As Dr. McDonough explained, these F&P reading levels are not appropriate measures of progress for a child with a disability like R.H.; however, given the simplicity of the F&P texts used here, they do at least demonstrate R.H.'s unquestioned *lack* of reading skill.

74.    After reviewing this evidence and listening to teacher testimony, the IHO roundly rejected the District's rosy story about R.H.'s robust reading program and progress. Moreover, as noted above, she found that, in May of 2021 and May of 2022, the District *deliberately inflated* R.H.'s reading scores by giving her multiple running records assessments in close succession. IHO Op. at 15-16. Nevertheless, *even with inflation,* the District's records showed R.H. advancing only

from a kindergarten to mid-first grade reading level *over three school years*. *Id.* at 16. This is exactly the kind of *de minimis* progress that the *Endrew F.* court held was not indicative of a FAPE.

75.    Dr. McDonough's testing confirmed how little reading skill R.H. had acquired as of the fall of 2022.  Using the Wechsler Individual Achievement Test, Fourth Edition (WIAT-4), a widely accepted, norm-referenced test, she found that R.H. scored in the *Extremely Low* range in the following reading subtests: Reading Comprehension, Word Reading, Pseudoword Decoding, Orthographic Fluency, Decoding Fluency, and Oral Reading Fluency. Ex. J at 10, 17.

76.    She wrote:

[R.H.] has not made adequate progress in acquiring basic academic skills in the West Hempstead School District. [R.H.] requires a smaller setting than her current 12:1:1 classroom due to her memory and language impairments. She requires ample opportunity for repetition and rehearsal of new information. She also requires a smaller cohort of students to minimize distractibility and to allow for more individualized attention from teachers so that she can receive frequent redirection and refocusing as well as pre-teaching and reteaching. She requires placement in a class no larger than 6:1:1 or 6:1:2 with peers who also have language impairments and similar learning needs.

Ex. J. at 15.

77.    Dr. McDonough also gave unrebutted testimony that a child with R.H.'s disability profile required early, intensive interventions years before the District purported to provide it.  She explained that accepted studies prove that where appropriately intensive interventions are delayed (or as here omitted altogether), children will always struggle in learning to read. Tr. 1602:18-1603:22.

78.    The IHO found that the District failed to evaluate R.H. in reading and failed to program for her appropriately, an implicit adoption of Dr. McDonough's testimony.  Implicit credibility findings by an IHO are entitled to the same deference as explicit findings. *See, e.g., Cty. Sch. Bd. v. Z.P.*, 399 F.3d 298, 306-07 (4th Cir. 2005) ("We have held that credibility

determinations implicit in a hearing officer's decision are as entitled to deference … as explicit findings."). The District introduced no evidence to counter McDonough's testimony. The SRO inexplicably and improperly ignored her testimony altogether.

79.    In sum, the IHO correctly held that the District denied R.H. a FAPE when it failed to offer R.H. appropriate reading instruction, and that R.H. made no measurable progress in reading. The evidence in the record overwhelmingly supports her conclusion.

**D.  The SRO incorrectly rejected the IHO's holdings that the District offered inadequate programming for R.H. and that R.H. made no progress in reading.**

80.    The SRO inexplicably rejected the IHO's findings that the District's reading program was inadequate and that, as a result, R.H. made no real progress in reading. For the reasons explained above, the Court owes no deference to his explicit and implicit credibility findings, and little to no deference to his interpretations of objective measures of progress.

81.    Elevating form over substance and failing to grapple with the IHO's specific findings, the SRO excused the District's years-long failure to offer R.H. adequate reading programming. In addition, the SRO improperly relieved the District of its affirmative burden of proof by drawing factual inferences in its favor without evidence to support those inferences.

82.    For example, the SRO cited the following general guidance from an October 2023 "Q&A" document from the New York Office of Special Education:

**24. If specialized reading instruction is required and is provided by a certified reading teacher, what service or program should be listed in the IEP (is it resource room, a supplemental service)?**

For a student with a disability recommended for specialized reading instruction to be provided outside of the general education class, this service could be recommended in the IEP of the student as special class, related service or resource room program.

Specially-designed instruction provided to an individual student with a disability or to a group of students with disabilities by a certified special education teacher in the student's general education classroom to aid the student(s) to benefit from the

general education class instruction could be recommended in the IEP of the student as direct consultant teacher services.

*See* **New York IEP Q&A**, at 31, attached as Ex. A.

83.      This passage (indeed the whole document) gives guidance to CSEs about what categories of information an IEP must include (*i.e.*, form); it says nothing about the substance of the individualized programming a child requires (*i.e.*, content).

84.      The *Endrew F.* court stated that an IEP is "not a form document" and must address the individual circumstances of each child, and only after careful review of the child's educational history and their present levels of performance.

85.      Ignoring this clear command, and the *Endrew F.* standards more broadly (and again relieving the District of its burden of proof*)*, the SRO found that because the May 2021 IEP ostensibly complied with the *form* laid out in the above New York IEP Q&A, it did not have to include any detail about (let alone explain the applicability or appropriateness of) the *substance* of R.H.'s program.  All the CSE had to write, according to the SRO, was that R.H. would receive "specific reading instruction" in a "12:1+1 setting."  SRO Op. at 28.  And all it had to prove at trial, according to the SRO, was that the IEP existed as written. But by this reasoning, R.H.'s IEP was arguably adequate to describe the programming for *any* child needing specific reading instruction, despite saying nothing about the *specialized* instruction she would receive.  *Endrew F.* required the District to prove that it offered R.H. individualized content. The SRO erred by removing the District's burden.

86.      Further, the SRO selectively *disregarded* New York's more specific, August 2018 Q&A for "Students with Disabilities Resulting from Dyslexia, Dysgraphia and Dyscalculia," (New

York Dyslexia Q&A). *See* **New York Dyslexia Q&A**, attached as Ex. B.[6] This Q&A gives specific guidance to CSEs about meeting the needs of dyslexic students like R.H. Consistent with *Endrew F.*, it states, in relevant part: "The specially designed instruction provided to each student should be based on the information documented in the present levels of performance and tailored to his or her individual, disability-related needs." *Id.* at 6. In other words, the details of an IEP *matter* for students with dyslexia (and all students).

87. The IHO properly weighed the evidence and arrived at a just conclusion in light of applicable standards.

88. The New York Dyslexia Q&A continues, echoing the IHO's own language: "When discussing a student's present levels of performance, the CSE should review what prior instructional methods and strategies have been utilized with the student ***to avoid reinstituting programs that have not proven effective in the past***." *Id.* (Emphasis added); *see* IHO Op. at 20.

89. Discussing how such programs should be delivered, it states:

> Specially designed instruction must be provided with ***appropriate frequency, duration, and instructional grouping specific to the student's individual, disability-related needs***. Effective instruction for students with disabilities resulting from dyslexia, dysgraphia, and/or dyscalculia should be ***explicit and systematic***. This means that information is presented in a clear and straightforward way, and the student is provided with step-by-step examples during each lesson.
>
> Instruction should follow a logical order where easier concepts are taught before harder concepts, and ***each lesson should be scaffolded*** building upon skills that the student has previously been taught. Instruction in this manner should also reflect the principles of universal design for learning (i.e., providing multiple means of engagement, representation, and expression during instructional activities) through the use of multisensory strategies that engage more than one sense (e.g., touch, movement, sight, hearing) at a time.
>
> There should be many opportunities for the student to practice skills in the context of meaningful activities, and the student should be provided with ongoing and specific corrective feedback.

---

[6] SRO Steven Krolak relied on the **New York Dyslexia Q&A** just two weeks earlier on September 18, 2024. *See* SRO No. 24-351, https://www.sro.nysed.gov/decision/2024/24-351 (visited Jan. 4, 2025).

Ex. B at 6 (emphases and paragraph spacing added).

90.     Discussing the competencies reading programs should address, it states:

Specially designed instruction for students with dyslexia should incorporate and build on the overall domains of effective reading instruction (i.e., **phonological/phonemic awareness, phonics, comprehension, fluency, and vocabulary**).

Specially designed instruction for students with dyslexia should, however, **explicitly and systematically target** the specific reading skills with which the student demonstrates difficulty.

*Id*. (Emphases and paragraph spacing added).

91.     Ignoring this specific New York state guidance, the SRO excused the District's

failure to meet (and, of course, to prove that it met) New York standards in both form and content:

- He did not make the District specify or offer instruction for R.H. based on her IEP's present levels of performance (which were vague and inaccurate in any event) and tailored to her individual, disability-related needs (which the District had never established).

- He did not make it identify or state what prior instructional methods and strategies were used with R.H. so that it would avoid reinstituting programs that had in fact not proven effective for her in the past.

- He did not require that its IEPs state anything about the frequency, duration, and instructional grouping specific to the R.H.'s individual, disability-related needs.

- He did not hold it to the obligation to offer "explicit and systematic" programming.

- He did not make it provide R.H. with scaffolded, multisensory learning.

- He did not require that it explicitly and systematically target the specific reading skills (which it never identified) with which R.H. had long demonstrated difficulty.

- He did not make the District give R.H. ongoing and specific corrective feedback.

- He did not make the District incorporate and build on the overall domains of effective reading instruction (*i.e.*, phonological/phonemic awareness, phonics, comprehension, fluency, and vocabulary).

- He did not make the District provide Parents with coherent, meaningful progress tracking documentation at regularly specified intervals.

92. Instead, the SRO found, preposterously, that the District's bare assertion in R.H.'s IEP that it would provide "specific reading instruction" in a "12:1+1 special class" (SRO Op. at 28-29) was, in effect, legally adequate IEP short hand for all of the components necessary to an evidence based reading program taught with fidelity. The SRO erred by completely relieving the District of its burden of proof.

93. The SRO also rejected the IHO's finding that R.H. made no progress in reading. Rather than address (let alone grapple with) the IHO's finding, he credited the District's generic progress report (Ex. D-23), which, as discussed above, represented that R.H. – a fourth grader who couldn't read "what" "big" or "little" – was making meaningful progress in decoding.  As noted above, the Court owes no deference to the SRO's misinterpretation of an objective indicator of progress.

94. The SRO's decision completely overlooked the obvious: As of fourth grade, R.H. really could not read at all. Worse, when the District failed to explain the perceived fluctuation in R.H.'s reading levels, the SRO resorted to speculation outside of the record to do so:

> I further note that, according to the IHO's grade level descriptors, the student's instructional level "fluctuations" between levels "C" and "G" using Fountas and Pinnell indicators during the 2020-21 and 2021-22 years represented a range from kindergarten to mid first grade, ***which was not necessarily an unexpected range of performance for a student with attention, focus and stamina concerns.***

SRO Op. at 31-32 (emphasis added).

95. This finding was clearly erroneous for two reasons: *First*, nothing in the record supports the SRO's speculation that R.H.'s "attention, focus and stamina" caused fluctuation in her reading. While R.H. most certainly struggled with attention, focus and stamina, nothing – no testimony or documents – linked those struggles with *fluctuation* in reading. Nor was this a fact that the SRO could properly infer from supposed topical expertise or experience. To the contrary,

Dr. McDonough gave unrebutted testimony that when a child learns to read a word, it is orthographically "mapped" in her brain so that she should never lose the ability to read it. The District introduced no evidence to challenge this well-accepted expert opinion. The Court owes the SRO no deference on this completely speculative, scientifically false finding.

96.      *Second*, ironically, just a few pages earlier, the SRO dismissed the IHO's concerns over R.H.'s attention, focus and stamina. As discussed more fully below, he excused the District's failure to include a Study Skills goal in R.H.'s May 2022 IEP because he found (again, ignoring overwhelming evidence) that she had achieved her 2021-22 IEP goal of attending to tasks for 10 minutes. *Id*. at 22. In other words, according to the SRO, R.H. achieved her "attending" goal at the end of 2022, but, at the same time, her severe problems with "attention, focus and stamina" caused wild fluctuation in her reading ability. This is just one of many examples of the SRO's opinion being poorly reasoned.

97.      In summary, the SRO had no factual or legal basis to reverse the IHO's holdings that the District failed to prove that it offered R.H. an appropriate reading program and prove that made progress in reading.

**IMPROPER GOALS**

**E.  The IHO correctly held that the District failed to write specific, data-driven, measurable, appropriately ambitious goals for R.H.**

98.      The IHO correctly found that the District failed to write specific, data-driven, measurable, appropriately ambitious goals for R.H., a serious violation of the IDEA. IHO Op. at 10-13.

99.      *Endrew F.* requires that a school district do far more than go through the motions and just write "something" into an IEP that may be superficially defensible but is lacking in substance. The IEP's goals must be individualized in light of the child's circumstances,

measurable, and "appropriately ambitious." Goals must be *real*. The IHO, after presiding over and reviewing the vast record here, properly concluded that R.H.'s goals were, in effect, illusory. As explained below, each goal had one or more clear flaws. There was no way for the CSE (or a reviewing hearing officer or court) to use them to assess her progress.

100. The IHO held correctly that the District's reading goals were inadequate. Her decoding goal – that R.H. would apply learned decoding skills to a text at her reading level – was too vague to be meaningful. *Id*. She noted that her reading "sight word" goal did not have a baseline. *Id*. She found that the reading comprehension goal (R.H. retelling a story) did not state whether R.H. would read the story herself or if it was to be read to her – a factor that was especially important in monitoring her reading progress given the minimal reading skill she had shown to date. *Id*.

101. With respect to writing, the IHO noted that while the first goal was to write a 4-sentence paragraph, R.H. had not yet shown she could copy a sentence, let alone compose one of her own. *Id*. The second writing goal, to edit and add details to a paragraph, was unmeasurable because it did not specify the quality or quantity of details to add. *Id*.

102. The IHO correctly noted that R.H.'s first math goal, to add 2-digit numbers, bore no relation to her then current math level; she relied on drawing dots and counting them to perform math operations. Moreover, the goal of adding 2-digit numbers without regrouping was in place in May of 2020 and the school reported that it expected her to achieve it by the end of the 2020-21 school year. *Id*. Then, the District copied the goal verbatim into her 2021-22 IEP. And in June 2022, it repeated that it expected her to achieve it by the end of the 2022-23 school year. The second math goal, to identify keywords in word problems, did not specify what words she would identify.

Moreover, she had evidently achieved a substantially similar goal at the end of the 2020-21 school year. *Id.* at 12.

103.    Her vocabulary goal, to "use vocabulary through association," did not specify the vocabulary level or the number of words to be learned, and it was to be measured through "Structured observations," as opposed to the data collection sheets or recorded observations, etc. proposed in other goals. *Id.*

104.    Her first motor skills goal provided for her to "improve" her visual perceptual skills by copying a design but it gave no proposed measurement of improvement. *Id.*

105.    The IHO astutely noted that R.H.'s second motor skills goal – to be able to sit upright for 10 minutes – undermined the District's dubious claim that she had mastered the goal of attending to a lesson for 10 minutes. Moreover, the District never explained its usage of the phrase "minimal prompt" in this and other goals. *Id.*

106.    Her third motor skills goal – to complete lower body exercises – was not measurable in that it included no exercise duration. *Id.* Likewise, her fourth motor skills goal – to participate in physical activity for 10-15 minutes – did not say what type or level of activity. *Id.* Her fifth motor skills goal – to maintain balance for 10 minutes – again had no specific measurement criteria. *Id.*

107.    Her sixth motor skills goal – to use far-point copying with appropriate spacing and line placement – omitted that  R.H. needed large, spaced paper for this skill and the District failed to prove she even possessed the requisite far point copying skills needed to achieve the goal in the first place; if anything, this was a noted area of struggle related to vision that required its own goal(s), which the District failed to adequately assess and address using appropriate therapies. *Id;* Tr. 1430:25-1431:3.

108.    The IHO correctly found that **none of R.H.'s IEP goals were adequate**, none flowed from accurate present levels of performance, and none were implemented based on timely and evidence-based decisions. *Id.*

**F.   The SRO incorrectly excused the District's failure to write data-driven, measurable, appropriately ambitious goals for R.H.**

109.    Rather than grapple with the IHO's findings, the SRO excused the District's failures, holding in effect that, by merely including topical goals, the District met its burden.

110.    Tacitly acknowledging the inadequacy of the District's goals, he blatantly misstated Second Circuit case law, writing: "[C]ourts generally have been reluctant to find a denial of FAPE on the basis of an IEP failing to sufficiently specify how a student's progress toward his or her annual goals will be measured when the goals address the student's areas of need." SRO Op. at 22 (citing, *inter alia, D.A.B. v. N.Y.C. Dep't of Educ.*, 973 F. Supp. 2d 344, 359-60 (S.D.N.Y. 2013)).

111.    None of the cases the SRO cited – all decided before *Endrew F.*[7] – state this proposition, which would allow Districts to eschew all details in goals so long as they generally address "areas" of need (which the District did not even do here).  To the contrary, each court the SRO cited actually ruled that a district may overcome writing vague goals **only by showing that the IEP had other, more specific ways to measure the child's progress** (*i.e.*, measurable and specific **short-term objectives** for each goal or teacher testimony that they had collected more specific data).

112.    For example, the *D.A.B.* court wrote: "When an IEP **contains a significant number of specific short-term objectives to supplement otherwise broad annual goals**, the vagueness of the annual goals alone will not rise to the level of the denial of a FAPE."  *D.A.B.*, 973 F. Supp. 2d

---

[7] Notably, the SRO decision mentions *Endrew F.* only in passing and certainly fails to meaningfully grapple with its holding as applied to these facts.

at 359 (emphasis added). In discussing the IEP before it, the *D.A.B.* court cited 96 short-term objectives that accompanied 17 annual goals, all of which spanned 16 pages of the IEP. *Id.* at 353, 359. The court then highlighted how such detailed objectives in the IEP's reading goal cured the defects in the goal itself:

> [T]he annual goal that "D.B. will improve his reading skills," contains six detailed and measurable short-term objectives, among them:
>
> > • D.B. will match at least 25 words to the corresponding pictures and vice versa with 80 % accuracy
> >
> > • D.B. will receptively identify as a listener at least 25 written words, with 80% accuracy
> >
> > • D.B. will match 15 words in different fonts with 90% accuracy
> >
> > • D.B. will read 10 C-V-C (Consonant-Vowel-Consonant) words, with 80% accuracy.

*Id.* at 360 (internal references and corrections omitted).

113.    In contrast with the IEP in *D.A.B.*, R.H.'s IEPs had *no short-term objectives* to cure its vague and inadequate goals. In fact, all 12 goals fit on just two pages and as explained in more detail, *supra*, the IEP's present levels and progress tracking/reporting were fundamentally unreliable.

114.    The SRO excused the District's inadequate goals without meaningful analysis. For example, unlike the IHO, who critiqued the IEP's reading comprehension goal by noting that it failed to state whether R.H. would be reading or would have the text read to her, the SRO simply noted in passing that there *was in fact a comprehension goal* (he covered all three reading goals in one sentence) and deemed it adequate. SRO Op. at 20. The SRO cited no evidence to salvage this inadequate goal – no mention of short-term objectives – under the standard laid out in *D.A.B.*, the case he cited.

115.    Similarly, the IHO held that the District failed to include any Study Skills goal for R.H.'s 2022-23 IEP.  IHO Op. at 18.  After observing 12 days of testimony and reviewing the entire record, she found it was "not plausible" that R.H. no longer needed a Study Skills goal.  *Id*. Indeed, the District's own speech language pathologist, Ms. Mock, testified that R.H.'s ability to attend to lessons was inconsistent, negatively affected her performance, and was difficult to measure:

> [R.H.'s] attention was very, very impactful on her therapy sessions and there were times that she did achieve them and then there would be two weeks later she would get a fraction correct that she did the week before or two weeks before so it was so inconsistent. It was obvious when she was attending that she could attain the goals and then when she was distracted she couldn't. I don't know if that answers your question but it was just inconsistent. It's hard to measure when attention comes into play.

Tr. at 732:25-733:17.

116.    When asked why there was no fifth grade Study Skills goal, R.H.'s teacher Ms. Reetz testified that measuring attention is difficult because "everybody has good days and everybody bad days." Tr. at 884-85.  Reetz then questioned whether R.H. or *any* student could attend to lessons for 10 minutes, adding that were she to write such a goal it would be for the student to attend for "three minutes, five minutes max." Tr. at 885.

117.    The SRO rejected the IHO's conclusion that the omission of a Study Skills goal was a serious flaw in R.H.'s IEP.  Instead, he credited R.H.'s progress report (disregarding the overwhelming evidence that it was inaccurate), which stated without citing data that R.H. "was expected to achieve her study skills annual goal of maintaining her attention to task for 10 minutes."  SRO Op. at 22 (citing D-23 at 2). Crucially, this supposed measure of her progress towards achieving her goal was selected from five pre-written options:

| Goal Progress Mark Legend | | | | | |
|---|---|---|---|---|---|
| A | Achieved - The student has achieved the goal. | PG | Progressing Gradually - The student is making less than anticipated progress but may still achieve the goal. | NA | Not Achieved - The student has not achieved the goal. |
| PS | Progressing Satisfactorily - The student is making satisfactory progress and is expected to achieve the goal. | PI | Progressing Inconsistently - The student is making inconsistent progress and may not achieve goal. | SC | See Comments |

118.    The SRO did not explain why he credited a pre-written, generic sentence from a progress report over the far more specific, contrary testimony from several *District* witnesses. His decision is also inconsistent with Ms. Reetz's testimony – which he himself subsequently cited – expressing doubt that *any* student would achieve the goal. *Id.* (Citing Tr. at 884-85). In other words, contrary to the IHO's finding, the SRO found that R.H. achieved a Study Skills goal that every witness believed she did not achieve, and that her own teacher said no child could achieve.

119.    In sum, the SRO only deemed that R.H.'s goals were unproblematic and met the IDEA's criteria by declining to evaluate them *against those criteria* or in light of the case law he himself cited. The Court owes no deference to the SRO's unsupportable conclusions.

## BEHAVIORAL DATA AND PROGRAMMING

### G. The IHO correctly held that District failed to collect behavioral data for R.H. and did not create a needed Behavior Plan.

120.    The IHO rightly found the record "replete" with evidence that R.H. had behaviors that interfered with her learning, and that the District failed to administer a functional behavioral assessment (FBA) or implement a behavior intervention plan (BIP) to address these behaviors. IHO Op. at 8.

121.    The IHO's holding is consistent with longstanding Second Circuit precedent:

> The failure to conduct an adequate FBA is a serious procedural violation because it may prevent the CSE from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all. As described above, such a failure seriously impairs substantive review of the IEP because courts cannot determine exactly what information an FBA would have yielded and whether that information would be consistent with the student's IEP. The entire purpose of an FBA is to ensure that the IEP's drafters have sufficient information about the student's behaviors to craft a plan that will appropriately address those behaviors.

*R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012).

122.    Testimony from several District witnesses (Ms. Mayer, Ms. Mock, and Ms. Reetz) supports the IHO's holding that the District failed to gather adequate behavioral data. Ms. Mock,

a board-certified behavior analyst (BCBA), agreed that "R.H. visibly presents with significant and numerous needs when it comes to her academics." Tr. at 602:24-603:4. Mock also noted that R.H. struggled to maintain her attention even in a 1:1 setting, and that she observed enough instances where R.H. needed to take breaks that she recorded it in her reports. Tr. at 607:19-24, 607:25-608:8.

123.    Dr. McDonough gave unrebutted testimony that evidence-based behavioral interventions derived from an FBA would help R.H. with her ability to stay on task. Tr. at 1628:11-1629:20.

**H.  The SRO incorrectly held that R.H. did not need an FBA or BIP.**

124.    The SRO rejected the IHO's finding that the District should have administered an FBA and created and implemented a BIP. SRO Op. at 22-25. Again, rather than grapple with the IHO's finding and the overwhelming testimony supporting it, the SRO, who did not observe the witnesses' testimony, cited highly general language in annual documents to find that "the student's behavior did not impede her learning or that of others such that it would necessitate an FBA." SRO Op. at 25

125.    Rather than analyze behaviors that impeded R.H.'s own learning, the SRO pointed to evidence that she was not a "behavior problem" for her peers as evidence that she did not need an FBA or BIP.  As with the SRO's unsupported and scientifically invalid explanation for R.H.'s fluctuation in reading, his interpretation of the reported facts here has no basis in the record.  In fact, the SRO offered a *non sequitur*. Whether R.H. was *externally disruptive to others* had nothing to do with the highly corroborated and undisputed fact, clearly documented in her IEPs, that her behaviors *impeded her own learning*.  The SRO's finding was also internally inconsistent. As noted above, he found – ignoring the credible expert evidence in the record – that R.H.'s behaviors – her "attention, focus and stamina concerns" – were so problematic that they caused her reading ability

to fluctuate. SRO Op. at 32. These were the very concerns that Dr. McDonough testified should have been analyzed with an FBA and addressed through a BIP.

126.    The Court does not owe the SRO deference on its interpretation of objective progress reports, especially where, as here, it failed to grapple with credible evidence that contradict its interpretation, and where its own reasoning is internally inconsistent.

## VISION SERVICES

### I.  The IHO correctly held that the District was aware that R.H. had vision deficits and could have needed Vision Therapy but failed to provide it.

127.    A school district must provide a FAPE by offering special education and related services tailored to meet a student's unique needs and enable them to access the general education curriculum.

128.    Related services include ***developmental***, corrective, and supportive services necessary for the child to benefit from special education. 20 U.S.C. § 1401(26)(A) (emphasis added).

129.    Courts and SROs have held that vision therapy is a necessary related service when visual impairments adversely impact a student's educational performance. *See, e.g., Cobb County Sch. Dist. v. A.V.*, 961 F. Supp. 2d 1252, 1273–1274 (N.D. Ga. 2013); *DeKalb Cnty. Sch. Dist. v. M.T.V.*, 413 F. Supp. 2d 1322, 1328-29 (N.D. Ga. 2005); SRO No. 18-102 (student received vision therapy as part of the student's special education programming).

130.    Here, the IHO noted that the District was aware of R.H.'s visual deficits but failed to meet its burden of proving that it addressed these deficits through appropriate evaluations, programming and/or related services.

131.    The IHO also credited expert Dr. Michele Bessler's testimony that R.H.'s vision deficits were developmental in nature, had negative impacts on her learning and academics, and that vision therapy was addressing those needs.

132.    Indeed, no one during the hearing disputed that R.H.'s visual deficits required interventions for her to benefit from special education.

133.    Nevertheless, the District failed to conduct a comprehensive evaluation to determine the nature of R.H.'s visual deficits, how they affected her ability to learn, and what would be required to appropriately address them.   And it failed to discuss with Parents whether R.H.'s vision deficits – of which it was aware – could best be addressed through proper occupational therapy (OT), vision therapy, or a combination of services.

134.    In summary, the IHO correctly held that the District did not meet its burden of proving that it addressed R.H.'s needs in this domain.

### J.    The SRO incorrectly shifted the burden of proof in holding that Parents failed to prove that Vision Therapy was *not* needed.

135.    The SRO incorrectly shifted the burden of proof in holding that Parents failed to prove that Vision Therapy was *not* needed. And he erroneously concluded, contrary to the IHO's holding and the overwhelming evidence in the record, that R.H. did not require a greater level of intervention than what the District provided through school-based OT.

136.    The SRO's analysis with respect to vision therapy demonstrates the overall asymmetry in his analysis. On the one hand, he scrutinized the IHO's FOFD to find perceived factual gaps undermining its conclusions where they favored Parents, not once perusing the record to identify additional evidence in the record, not cited by the IHO, that might support her findings. On the other hand, where he deemed it necessary, he readily delved into the voluminous testimonial

and documentary record to select facts, often out of context, that appeared to bolster the District's case.

137.    For example, the SRO wrote: "[T]he evidence in the hearing record shows that the district identified a need and was providing [OT] services to address such need."

138.    But Dr. Bessler's unrebutted testimony, which the SRO ignored or discounted, established that the OT services offered by the District were not tailored to R.H.'s vision-related deficits. Bessler opined that while school OT may address sensory integration or fine motor skills, it will not remediate deficits related to developmental vision.

139.    As noted above, IDEA related services include "developmental, corrective, and supportive services necessary for the child to benefit from special education." The SRO quoted this definition, but then ignored the word "developmental" to arbitrarily mischaracterize the vision services offered here as "medical in nature" and, thus, somehow not required to be provided by the District. SRO Op. at 26.  The SRO cited nothing to support his holding that vision therapy is not a valid IDEA "related service." As noted above, there is precedent both from federal courts and the SRO itself endorsing vision therapy as an IDEA related service.

140.    The SRO also erred by labeling Dr. Bessler's February 2023 report "retroactive" because it was not available to the District's CSEs.  SRO Op. at 27.  By this reasoning, no parent could ever engage an expert to challenge the validity of an IEP based on a CSE's failure – as the CSE failed here – to evaluate a child in all areas of suspected disability.

141.    Thus, while Dr. Bessler's February 2023 developmental vision evaluation report itself was not available to the CSEs in May 2021, May 2022, or August 2022, the District had a duty to ensure that its IEPs were reasonably calculated to provide educational benefit based on the information available at the time. The SRO erred in ignoring Dr. Bessler's expert testimony, which

amply supported parental claims that the District's failure to conduct a developmental vision evaluation earlier, when the Student's struggles were plainly evident, demonstrates a lack of thoroughness in its assessment process and a violation of its obligations under the IDEA.

142.    In sum, the SRO erred in reversing the IHO's holding that the District denied R.H. a FAPE by failing to identify R.H.'s vision deficits and by failing to provide appropriate interventions for them.

## COUNT I.

### Denial of FAPE; Reversal of Erroneous SRO Decision.

143.    The above allegations of SRO error are illustrative rather than exhaustive. The SRO's decision, unlike the IHO's FOFD, fails to capture that R.H. is a young girl who could not functionally read, write, or do math, and who needed and needs intensive long-term intervention to make progress appropriate in light of her circumstances.

144.    "When the decisions of an IHO and an SRO conflict, the Court should generally defer to the SRO's decision as the final decision of the state authorities particularly when the state officer's review has been thorough and careful. But where the district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges." *Moonsammy v. Banks*, 2024 U.S. Dist. LEXIS 173688, at *14-15 (S.D.N.Y. Sept. 23, 2024) (quoting *R.E.*, 694 F.3d at 189; *M.H.*, 685 F.3d at 246) (internal quotes omitted).

145. Here, the SRO made incorrect, internally inconsistent findings of fact that contradict the IHO's findings, without explaining his departure from the IHO. This Court does not have to defer to the SRO's alternative factual conclusions, which were not based on any educational expertise and were not rooted in valid concerns of New York state policy.

146. The SRO applied incorrect legal standards and improperly shifted the burden of proof from the District to Parents, which resulted in his reaching incorrect legal conclusions.

147. Parents and Student have been denied a FAPE under the IDEA and the New York Education Code.

148. Wherefore, Parents ask that this Court reverse the SRO's decision, which is not well reasoned, and reinstate the presiding IHO's far more detailed and well-reasoned FOFD.

## COUNT II

### IDEA
#### *Attorneys' Fees*

149. Parents incorporate by reference each allegation stated above.

150. Parents prevailed in their due process action, as evidenced by the FOFD.

151. The District sought review of the FOFD before the SRO.

152. Parents believe they will prevail in this action for review, in which they request that this Court reverse the SRO's erroneous decision. Parents are therefore "prevailing parties" for purposes under the IDEA, 20 U.S.C. § 1415(i)(3)(B).

153. A prevailing party under the IDEA is entitled to reasonable attorneys' fees. 20 U.S.C. § 1415(i).

154. Wherefore, Parents are entitled to reasonable attorneys' fees for their Due Process hearing, SRO proceedings, and this action for administrative review of the erroneous SRO decision.

155.    Parents are further entitled to reasonable fees and costs for additional time expended and costs incurred in seeking attorneys' fees in this federal action.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

- Assume jurisdiction of this action.

- Find that the SRO erred when it reversed the IHO's FOFD, in whole or in part.

- Vacate the SRO's decision and reinstate the IHO's decision.

- Find that Parents are prevailing parties under the IDEA.

- Award Parents reasonable attorneys' fees, costs, and expenses.

- Award Parents pre- and post-judgment interest.

- Award any other relief this Court deems appropriate.

Dated: January 9, 2025
Nassau County, New York

Respectfully Submitted,

/s/ Richard F. Corrao, Esq.
**Law Offices of Susan Deedy & Associates**
Attorneys for Plaintiffs
1600 Stewart Avenue, Suite 609
Westbury, NY 11590
Office: (516) 221-8133
Fax: (516) 221-3011
rcorrao@susandeedylaw.com

/s/ Benjamin J. Hinerfeld. Esq.
Benjamin J. Hinerfeld (BH 2180)
**Law Offices of Benjamin J. Hinerfeld**
Co-Counsel
9 Stoddard Street
Plymouth, MA 02360
1528 Walnut Street, Suite 1100
Philadelphia, PA 19102
447 Broadway 2nd Floor
New York, NY 10013
Office (508) 591-0385
Cell (215) 694-7432
Fax (215) 689-2423
Ben@hinerfeldlaw.com