**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____X

**T.H. and E.H.** individually, and on behalf of their child,
R.H., a minor,                                                    **Case No. 2:25-150-NJC-JMW**

Plaintiffs,

     -against-                                      Individuals with Disabilities
                                                                  Education Act;
                                                                  N.Y. Educ. Law § 4401 *et seq*.
**West Hempstead Union Free School District**

Defendant.
_____X

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
JUDGMENT ON THE ADMINISTRATIVE RECORD**

# TABLE OF CONTENTS

Table of Contents....................................................................................................................ii

Table of Authorities.............................................................................................................iii

Issues Presented ...................................................................................................................vi

I.   WHY WE'RE HERE ........................................................................................................1

II.  LEGAL FRAMEWORK AND STANDARD OF REVIEW UNDER THE IDEA ..........2

    a.  The basic FAPE Standard........................................................................................2

    b.  The scope of the Court's review of the SRO's decision .................................................3

III. ARGUMENT.......................................................................................................................8

    1.  **The District committed procedural IDEA violations that resulted in a denial of FAPE.  The SRO failed to analyze these violations fairly or cumulatively, and then improperly overturned the IHO's holding.** ......................8

        a.  Procedural Violation: Inaccurate Present Levels of Performance.........................9

        b.  Procedural Violation: Failing to undertake necessary tests................................12

        c.  Procedural Violation: Failure to administer a functional behavior assessment (FBA) .................................................................14

        d.  Procedural Violation: The IEPs contained inaccurate, unmeasurable goals ........15

        e.  Cumulative effect of the District's many procedural violations..........................24

    2.  **Substantive Violations: The District's Substantive Violations Denied R.H. a Fape**........................................................................................25

        a.  The District did not offer R.H. an appropriate reading program.........................25

        b.  The District's 12:1:1 placement for R.H. was inappropriately large. The District chose it because there was no viable alternative ....................28

IV. CONCLUSION...................................................................................................................30

# TABLE OF AUTHORITIES

*A.D. v. N.Y.C. Dep't of Educ.,*
  2013 WL 1155570 (S.D.N.Y. March 19, 2013) ................................................... 16

*A.M. v. N.Y.C. Dep't of Educ.,*
  845 F.3d 523 (2d Cir. 2017) ................................................................. 6

*A.W. v N.Y.C. Dep't of Educ.,*
  287 F. Supp. 3d 420 (S.D.N.Y. 2018) ....................................................... 7

*Amanda J. v. Clark Cnty. Sch. Dist.,*
  267 F.3d 877 (9th Cir. 2001) ............................................................... 4

*B.R. v. N.Y.C. Dep't of Educ.,*
  910 F. Supp. 2d 670 (S.D.N.Y. 2012) ....................................................... 3

*Bd. of Educ. v. C.S.,*
  90 F.3d 152 (2d Cir. 2021) ................................................................. 4

*Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist. v Rowley,*
  458 U.S. 176 (1982) ................................................................... *passim*

*Cerra v. Pawling Cent. Sch. Dist.,*
  427 F.3d 186 (2d. Cir. 2005) .............................................................. 25

*C.F. v. N.Y.C. Dep't of Educ.,*
  746 F.3d 68 (2d Cir. 2014) ............................................................ 28, 29

*C.L. v. N.Y.C. Dep't of Educ.,*
  2013 WL 93361 (S.D.N.Y. Jan. 3. 2013) ..................................................... 5

*D.A.B. v. N.Y.C. Dep't of Educ.,*
  973 F. Supp. 2d 344 (S.D.N.Y. 2013) ...................................................... 16

*D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.,*
  465 F.3d 503 (2d Cir. 2006) .............................................................. 16

*E.H. v. N.Y.C. Dep't of Educ.,*
  164 F. Supp. 3d 539 (S.D.N.Y. 2016) ...................................................... 20

*Endrew F. v. Douglas Cty. Sch. Dist. RE-1,*
  580 U.S. 386 (2017) ................................................................... *passim*

*F.O. v. New York City Department of Education,*
  976 F. Supp. 2d 499 (S.D.N.Y. 2013) .................................................. 6, 7, 10

*Gagliardo v. Arlington Cent. Sch. Dist.*,
    489 F.3d 105 (2d Cir. 2007) ................................................................5

*Karl by Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*
    736 F.2d 873 (2d Cir. 1984) ...........................................................3-4

*K.R. v. N.Y.C. Dep't of Educ.*,
    107 F. Supp. 3d 295 (S.D.N.Y. 2015) ..........................................4, 7, 8

*L.O. v. N.Y.C. Dep't of Educ.*,
    822 F.3d 95 (2d Cir. 2016) ............................................................6, 8, 9

*L.R. v. N.Y.C. Dep't of Educ.*,
    193 F. Supp. 3d 209 (2016) ...............................................................7

*M.H. v. N.Y.C. Dep't of Educ.*,
    685 F.3d 217 (2d Cir. 2012) ......................................................*passim*

*M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*,
    725 F.3d 131 (2d Cir. 2013) ...............................................................8

*Mavis ex rel. Mavis v. Sobol*,
    839 F. Supp. 968 (N.D.N.Y. 1993) .....................................................4

*R.E. v. N.Y.C. Dep't of Educ.*,
    694 F.3d 167 (2d Cir. 2012) ......................................................*passim*

*Rowley v. Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist.*,
    632 F.2d 945 (2d Cir. 1980) ...............................................................4

*S.B. v. N.Y.C. Dep't of Educ.*,
    2017 U.S. Dist. LEXIS 160056 (E.D.N.Y. Sep. 28, 2017) ...................18

*Schaffer v. Weast*,
    546 U.S. 49 (2005) ...........................................................................13

*T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*,
    752 F.3d 145 (2d Cir. 2014) ...............................................................8

*Town of Burlington v. Dep't of Educ.*,
    736 F.2d 773 (1st Cir. 1984) ..............................................................4

*W.S. v. Rye City Sch. Dist.*,
    454 F. Supp. 2d 134 (S.D.N.Y. 2006) .................................................7

*Walczak v. Fla. Union Free Sch. Dist.*,
   142 F.3d 119 (2d Cir. 1998) ........................................................................5

## STATUTES AND RULES

20 U.S.C. § 1400, *et seq.* (Individuals with Disabilities Education Act) ...........................*passim*

20 U.S.C. § 1401 ...........................................................................................2, 13

20 U.S.C. § 1412(a) ..............................................................................................2

20 U.S.C. § 1414(b) ..............................................................................................8

20 U.S.C. § 1415(i) ...............................................................................................3

34 C.F.R. § 300.304 ..........................................................................................8, 12

34 C.F.R. § 300.324 .............................................................................................20

N.Y. Educ. Law § 4401(c) .....................................................................................3

8 NYCRR § 200.4(b)(6)(vii) .................................................................................8

## I.  WHY WE'RE HERE.

We're here because R.H.'s parents believed the West Hempstead Union Free School District (District) when it promised to provide R.H. a robust education. For years, they received rosy reports that she was making good progress in District classrooms and assumed that her teachers and other providers were doing all they could to maintain that progress.

Like every child, R.H. is unique. She has a complex disability profile, rooted in a rare genetic mutation that manifests in, among other things, seizures, poor motor coordination, attention-deficit hyperactivity disorder (ADHD), impulsivity, poor receptive language, and poor working memory, all of which make it hard for her to learn at the pace of a typical child.

The Individuals with Disabilities Education Act (IDEA) tells schools that they have to look at each child and understand both her individualized needs and potential to learn.  Then they have to offer her a program that, according to best practices and sound science, gives her a fighting chance to reach her potential. No school can guarantee success, but so long as it conscientiously designs a program that addresses the child's unique needs and potential, it is following the IDEA.

District personnel clearly cared deeply for R.H. and wanted her to make progress. But in designing her individualized educational programs (IEPs) each year, they succumbed to the pessimistic belief that R.H. couldn't learn. The result was IEPs that offered her unambitious programming, neither grounded in science nor calculated for R.H. to reach her potential.

Fast forward. R.H.'s parents found themselves making the drastic decision to place R.H. in private school and sue their district.  An impartial hearing officer (IHO) presided over a 13-day trial, observing witnesses and scrutinizing how the District went about educating R.H.  Viewing the witnesses and extensive records in their totality, she perceived what was obvious: The District

never got a complete picture of R.H.'s needs or her potential, R.H made little progress, and Parents justifiably placed her in private school.

The District appealed to the New York State Review Officer (SRO). Often exalting form over substance, the SRO held that the IHO was wrong: the District had complied with its technical obligations.  In doing so, however, he disregarded significant evidence that R.H. had not made progress and repeatedly drew factual inferences, unsupported by the record, in the District's favor. He then offered factual and legal determinations without real explanations.

R.H.'s parents now ask the Court to review this case dispassionately and thoroughly, to scrutinize whether the SRO properly exercised his authority or, as they believe, acted arbitrarily, deciding this case by fiat rather than through reasoned articulation of well-settled law.  They ask the Court to withhold deference to the SRO because he did not earn such deference, and to find in their favor.

## II.  LEGAL FRAMEWORK AND STANDARD OF REVIEW UNDER THE IDEA

### a.  The basic FAPE standard.

Every child with a disability has the right to a Free Appropriate Public Education (FAPE).[1]
Schools deliver FAPE through Individualized Educational Programs (IEPs), which the Supreme Court labeled the centerpiece of the IDEA's education delivery system for disabled children:

> A comprehensive plan prepared by a child's "IEP Team"[2] which includes teachers, school officials, and the child's parents, an IEP must be drafted in compliance with a detailed set of procedures. These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances.[3]

---

[1] 20 U.S.C. §1412(a)(1).
[2] In New York, the IEP Team is called the Committee on Special Education (CSE).
[3] *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 390-91 (2017).

To provide a FAPE, an IEP must be "reasonably calculated to enable a child to make
progress appropriate in light of the child's circumstances."[4] "An IEP is not a form document. It is
constructed only after careful consideration of the child's present levels of achievement, disability,
and potential for growth."[5]

When parents believe their child has not been offered a FAPE, they can request a due
process hearing before an IHO. In New York, school districts bear the burden of proving at due
process hearings that they offered the child a FAPE.[6] The Supreme Court has emphasized that, by
the time of a hearing, districts should "be able to offer a cogent and responsive explanation for
their decisions that shows the IEP is reasonably calculated to enable the child to make progress
appropriate in light of his circumstances."[7]

New York has a "two-tiered" due process system. After an IHO issues a Finding of Fact
and Decision (FOFD), the aggrieved party may appeal to the New York State Review Officer
(SRO). The SRO operates as a one-person appellate court who can uphold or reverse an IHO's
decision.[8]

**b. The scope of the Court's review of the SRO's decision.**

A party aggrieved by an SRO's decision may file a civil action in state or federal court
challenging his or her decision. The text of the IDEA does not limit the scope of a court's review
of an IHO/SRO decision.[9] In *Board of Education v Rowley*, however, the Supreme Court's
majority inferred a limit on judicial review not found in the text:

> [T]he provision that a reviewing court base its decision on the "preponderance of
> the evidence" is by no means an invitation to the courts to substitute their own

---

[4] *Id*. at 399.
[5] *Id*. at 400.
[6] N.Y. Educ. Law § 4404(1)(c).
[7] *Endrew F.*, 580 U.S. at 404.
[8] *B.R. v. N.Y.C. Dep't of Educ.*, 910 F. Supp. 2d 670, 678 (S.D.N.Y. 2012).
[9] 20 U.S.C. § 1415(i)(2).

3

notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought.[10]

Shortly after *Rowley*, a divided Second Circuit panel wrote a direct, devastating summary of the new standard of review: "We are explicitly cautioned not to impose a particular substantive educational standard on the state or to require equality of opportunity for the handicapped in education."[11]  And judges immediately pushed back against the drastic limitations on the scope of review of SRO decisions. The dissent in *Karl*, focusing on the IDEA's text, accused the majority of abandoning its role to protect children with disabilities:

> *Rowley's* "gloss" on a clearly written statute requires only that the district judge give "due weight" to the views of the administrators; when those views conflict, it does not require him to accept the conclusion of the state's commissioner of education, nor does it relieve him of the burden of making the *de novo* determination required by Congress.[12]

Courts have since given various levels of deference to the SRO. In *Mavis ex rel. Mavis v. Sobol*,[13] the district court followed the First Circuit's standard for deference, noting:

> The traditional test of findings being binding on the court **if supported by substantial evidence, or even a preponderance of the evidence, does not apply**. This does not mean, however, that the findings can be ignored. The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. **After such consideration, the court is free to accept or reject the findings in part or in whole**.[14]

In *Gagliardo v. Arlington Central School District*, the Second Circuit acknowledged that the judiciary generally "lack[s] the specialized knowledge and experience necessary to resolve

---

[10] *Rowley*, 458 U.S. 176, 206 (1982). *Rowley* was the first Supreme Court decision interpreting the IDEA. It reversed a decision of the Second Circuit. *Rowley v. Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist.*, 632 F.2d 945, 946 (2d Cir. 1980).

[11] *Karl by Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 876 (2d Cir. 1984).

[12] *Id.* at 878-79 (Pratt, J. dissenting).

[13] 839 F. Supp. 968, 986-87 (N.D.N.Y. 1993)

[14] *Id.* at 986-87 (emphasis added) (quoting *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984)).

persistent and difficult questions of educational policy."[15] But it reiterated that courts must examine the record for 'objective evidence' that indicates 'whether the child is likely to make progress or regress under the proposed plan.'"[16]

A few years later, in *M.H. v. New York City Department of Education*,[17] the court explained how courts should assess IHO and SRO decisions:

> [T]he district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example ***whether the decision being reviewed is well-reasoned***, and whether it was ***based on substantially greater familiarity with the evidence and the witnesses than the reviewing cour***t.[18]

Subsequently, the Second Circuit and district courts have provided examples of when deference does and does not apply:

- *Little deference* when the SRO upsets the IHO's findings by citing documents that lack foundation or testimonial corroboration.[19]
- *No deference* to the SRO's legal conclusions, which are reviewed wholly *de novo*.[20]
- *No deference* when the SRO disregards the IHO's credibility assessments without explanation.[21]
- *No deference* when the SRO fails "to grapple with" evidence contrary to its own findings of fact.[22]
- *No deference* when the SRO's conclusions are not "grounded in a thorough and careful analysis"[23]

---

[15] *Gagliardo*, 489 F.3d 105, 113 (2d Cir. 2007) (emphasis added) (quoting *Rowley*, 458 U.S. at 206, 208). The Court asked the parties to address this point in its October 9, 2025 pre-motion conference: "In light of my reading of these two opinions, why, and this is an argument for the Plaintiffs, would I not exercise deference to the opinion of the SRO where the SRO's decision is high quality, well-reasoned and thorough. Because it is not my position as an appellate body, so to speak, to second guess the policy issues at play in a case like this." T4:14-19. The Court added: "So, why I ask both parties to address, you know, as a Federal Court, sitting as an appellate body that has been instructed by the Second Circuit not to second guess the policy issues here, it seems to me that there's sort of a policy dispute between the SRO and the IHO, and that is not where this court need to go."  T14:17-22.

[16] *Gagliardo*, 489 F.3d at 113 (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998)).

[17] *M.H.*, 685 F.3d 217, 244 (2d Cir. 2012).

[18] *Id*. (Emphasis added).

[19] *K.R. v. N.Y.C. Dep't of Educ.*, 107 F. Supp. 3d 295, 308 (S.D.N.Y. 2015).

[20] *Bd. of Educ. v. C.S.*, 990 F.3d 152, 165 (2d Cir. 2021).

[21] *Amanda J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 888 (9th Cir. 2001).

[22] *C.L.* v. *N.Y.C. Dep't of Educ.*, 2013 WL 93361 (S.D.N.Y. Jan. 3. 2013).

[23] *M.H.*, 685 F.3d at 248.

The Second Circuit and districts courts will reverse the SRO when its reasoning is unsound or its conclusions factually unsupported. Where the SRO ignores parts of the record that IHOs have cited, courts do not defer as a matter of policy or institutional expertise. Where the SRO purports to assign different weight to evidence than the IHO, courts insist that the SRO actually weigh the evidence and explain its reasoning for diverging from the IHO. For example, in *A.M. v. New York City Department of Education*, the court reversed the SRO when it improperly disregarded evidence of the child's needs:

> [W]here, as here, 'it appears plain that, contrary to the findings of the SRO,' the placement was "not adequately designed to address and improve" the child's educational needs, the administrative officer's analysis is deserving of no deference….[24]

It then considered evidence the SRO disregarded. It credited a private report, ignored by the SRO, that recommended a program that the CSE had omitted.[25] Ultimately, it overruled the SRO even though he ostensibly exercised educational judgment about a challenged program.

In *M.H.*, the court endorsed the district court's analysis that IEP goals were wanting, contrary to the SRO's finding, explaining:

> The [district] court again declined to defer to the SRO, who was satisfied with the short-term objectives, because "the SRO failed to address the measurability of P.H.'s academic goals, which formed the entire basis for the IHO's conclusion." … The district court concluded that the IHO's decision, which found the short-term objectives to be deficient, rather than the SRO's, merited deference because it was "reasoned and supported by the record."[26]

Similarly, in *F.O. v. New York City Department of Education*,[27] the SRO "utterly failed to meet the Second Circuit's standard" when it ignored a credible expert and failed to analyze

---

[24] *A.M.* v. N.Y.C. Dep't of Educ. 845 F.3d 523, 543 (2d Cir. 2017)(quoting *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 117 (2d Cir. 2016)).
[25] *Id*. at 543-44.
[26] *Id.* at 247 (internal citations to the *M.H.* district court opinion omitted).
[27] *F.O.*, 976 F. Supp. 2d 499 (S.D.N.Y. 2013)

conflicting evidence from the parents' witnesses.[28] The court wrote: "It is difficult to imagine how failing to address conflicting evidence could produce a 'well-reasoned' decision." It also rejected the argument – advanced here – that it had to defer to the SRO's weighing of evidence:

> The DOE contends that "this sort of weighing of conflicting evidence is exactly the sort of area in which judges are required to defer to the SRO." However, *the SRO must actually weigh conflicting evidence before the Court defers to the SRO for weighing conflicting evidence*; it is difficult to characterize the SRO's stubborn reliance on the DOE's witnesses, and failure to account for other witnesses' conflicting testimony, as "weighing" anything."[29]

In *R.E. v. New York City Department of Education*,[30] the Second Circuit reversed the SRO for a finding that was "against the overwhelming weight of the evidence."[31] It credited the IHO, which found that the student needed a higher level of support than was provided.[32]

In *L.R. v. New York City Department of Education*,[33] the court reversed the SRO for giving reasons that weren't reasons:

> [I]t is circular to attempt to demonstrate that a class is the least restrictive environment with sufficient support by merely stating that it is so. A more detailed explanation of what justified the 15:1 placement… should have been provided to demonstrate the IEP was "reasonably calculated" to provide benefits based on L.R.'s "unique needs."[34]

In *A.W. v New York City Department of Education*,[35] the court reversed the SRO for relying on one witness while ignoring contrary evidence from other witnesses.[36]  And in *K.R.*, the court reversed the SRO for relying on cold CSE meeting minutes to overrule the IHO and find that

---

[28] *Id*. at 514.
[29] *Id*. at 514 n.9 (cleaned up) (quoting *W.S. v. Rye City Sch. Dist*., 454 F. Supp. 2d 134, 145 (S.D.N.Y. 2006)); *M.H.*, 712 F. Supp. 2d at 166 n.18.).
[30] 694 F.3d 167 (2d Cir. 2012).
[31] *Id*. at 194.
[32] *Id*. (Emphasis added).
[33] 193 F. Supp. 3d 209 (2016).
[34] *Id*. at 215.
[35] 287 F. Supp. 3d 420 (S.D.N.Y. 2018).
[36] *Id*. at 434-35.

parents had been given fair opportunity to participate, despite there being no testimony to show that the CSE minutes were reliable.[37]

In all of these cases courts examined the record carefully and did not defer to the SRO unless it earned deference. The SRO must explain his reasoning persuasively, not simply announce a decision.

### III. ARGUMENT

1. **The District committed procedural IDEA violations that resulted in a denial of FAPE. The SRO failed to analyze these violations fairly or cumulatively, and then improperly overturned the IHO's holding.**

The Second Circuit has explained the standard for assessing whether a child has been offered a FAPE:

> [W]e [first] examine the procedural adequacy of the IEP, asking whether the state has complied with the procedures set forth in the IDEA. …[P]rocedural violations will entitle parents to relief only if they 'impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a FAPE to the parents' child, or caused a deprivation of educational benefits. That is, parents must articulate how a procedural violation resulted in the IEP's substantive inadequacy or affected the decision-making process. Multiple procedural violation, however, may cumulatively result in the denial of a FAPE even if the violations considered individually do not.[38]

An IEP must be based on complete, accurate evaluative information. The CSE must assess a student in all areas related to her suspected disability, including, where appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, vocational skills, communicative status and motor abilities.[39] And the CSE must not only gather enough information but also report it accurately so that courts can later evaluate its actions:

---

[37] 107 F. Supp. 3d at 308.

[38] *L.O.*, 822 F.3d at 109 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)); *R.E.*, 694 F.3d at 189-90; *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 160 (2d Cir. 2014); *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 139 (2d Cir. 2013)) (quotes omitted) (cleaned up).

[39] 20 USC § 1414(b)(3)(B); 34 CFR § 300.304(c)(4); 8 NYCRR § 200.4(b)(6)(vii).

Where… [a] CSE fail[s] to memorialize how it reached the terms of the IEPs, reviewing authorities and courts are left to speculate many months, or as in this case, many years, later as to how the CSE reached the terms of the child's IEP (*i.e.*, which, if any, evaluative materials the CSE actually considered).[40]

### a. Procedural Violation: Inaccurate Present Levels of Performance.

The IHO found that the CSE's failure to gather accurate present levels for R.H. led to inadequate programming. She pointed out the significant fluctuation in R.H.'s reading levels from second to fourth grades.[41] She even implied that, in May 2021 and May 2022, the District *deliberately inflated* R.H.'s reading scores by giving multiple assessments in close succession.[42]

At the end of third grade (2020-21), R.H. was reportedly reading at Fountas & Pinnell (F&P) Level G and was "approaching standards" for almost each reading skill.[43] However, at the start of fourth grade (2021-22), she could not read Level F or G texts and was moved back to Level D (kindergarten level) texts.[44] R.H. then read a level D book called *The Nice Little House.* Below is a page from the September 22, 2021 running record:[45]



On every page of *The Nice Little House* except the last, a character enters and says: "What a nice little house!" On the last page, R.H. – then in 4th grade – read "What a nice **big** house" as "*Went* a nice *little* house." Other running records from September 2021 show similar errors.[46]

---

[40] *L.O.*, 822 F.3d at 110 (2d Cir. 2016) (statutory citations omitted).
[41] I-15.
[42] I-16 ("[D]uring May 2022 - 3 assessments were given days within a 6 day period that appears again to get the level up.").
[43] DE212.
[44] DE292-305 (September 2021 running records sheets show that level G, F & E texts were all "hard" for R.H.).
[45] DE308 (emphasis in original).
[46] *See, e.g.,* DE292 ("was looking" read as "want was"); DE293 ("liked" read as "lid"); DE294 ("came" read as "come"); DE298 ("thing" read as "this" and "need" read as "new").

R.H. also frequently skipped entire words, but there is no data to explain why she did so.[47] The obvious inference is that she was not sounding out words; rather, she was looking at pictures and guessing.

The District's progress reports consistently concealed the seriousness of R.H.'s reading deficit from Parents. Her third grade reading goal was: "[R.H.] will apply decoding strategies when decoding unknown words." D E 1 9 6 , Ex. D-22. According to the District's written report, she "achieved" that goal by the end of third grade. Given her performance on the running records, this report on her decoding was clearly wrong.

The District's November 2021 progress report for R.H.'s decoding goal absurdly reported that R.H., who could not read "what a nice big house" was "Progressing Gradually – The student is making less than anticipated progress but may still achieve the goal." By the end of fourth grade, according to District records, R.H. was back reading at Level G, where she was a year earlier, the level students are expected to reach at the middle of first grade.

Rejecting the IHO's finding that the District failed to track R.H.'s reading progress accurately, the SRO repeatedly drew inferences favoring the District's case that find no support in the record – *i.e.*, he showed a "stubborn reliance on the DOE's witnesses, and fail[ed] to account for other witnesses' conflicting testimony."[48] For example, he cited from a February 2021 progress report to find that R.H. improved in "guided reading" from level C to E between September 2020 and January 2021.[49] But he ignored that her teacher conceded that "guided reading" was not individual reading; it was a group reading activity where children relied on pictures.[50] He also

---

[47] *See, e.g.,* DE294 (skipping "it's time to" from "Now it's time to go to sleep"); DE299 (reading "Anna put on" as "put it on"); DE301 (reading "She wanted her tooth to come out. She wanted it to come out now" as "She washed her tooth and she washed it to come now out." Omitting entirely "She brushed her loose tooth"); DE302 (reading "Don't wiggle your tooth" as "Didn't wiggle it came out").
[48] *F.O.*, 976 F. Supp. 2d at 514 n.9.
[49] SD-14 (citing DE116).
[50] T53:21-54:11.

ignored Dr. Erin McDonough's unrebutted expert testimony that guided reading was not a useful way to assess R.H.'s skill.[51]

The SRO next cited that the same progress report to show that R.H. improved in sight word reading from 43 to 65 words.[52] But he ignored that her teacher left no data to support this claim.[53] More to the point, any finding that R.H. made meaningful reading progress during the third grade is refuted by her struggle to read even a level D text in the fall of fourth grade.

As evidence of reading progress in fourth grade, the SRO cited a progress report from the 2021-22 school year purporting to show that R.H. advanced from "progressing gradually" to making "satisfactory progress" towards her reading decoding goal in fourth grade.[54] However, he ignored the data sheet for this report, which shows her decoding scores remained stagnant all year.[55] With respect to R.H.'s sight word goal for 2021-22, the SRO credited the same progress report's statement that R.H. was "progressing satisfactorily" by the end of the school year.[56] However, he again ignored that the data sheet was left completely blank.[57]

The SRO then cited a two-sentence, uncredited report in R.H.'s May 2022 IEP about "Wilson" to find that R.H. "was becoming more consistent in using skills taught."[58] But he ignored that the District failed to produce any actual Wilson Reading data to support this claim.[59] He also ignored Dr. McDonough's unrebutted testimony that Wilson was not an appropriate reading program for R.H. given her unique disability profile.[60]

---

[51] T1609:15-1611:23.
[52] SD-14 (citing DE116)
[53] T192:21-193:5.
[54] SD-29 (citing DE204).
[55] DE337.
[56] SD-29 (citing DE337).
[57] DE337.
[58] SD-29-30 (citing DE57).
[59] I-16. The District was on notice to produce Wilson records and data because Parents' Due Process Complaint (DPC) alleged that the District failed to offer Wilson reading with fidelity. *See* DPC, PE4-18, ¶¶ 59, 66, 67, 95.
[60] T1596:16-97:5.

The SRO misinterpreted objective measures of performance, disregarded the IHO's credibility determinations and failed to consider evidence contrary to his findings. By minimizing the misreporting of R.H.'s present levels, he failed to consider this procedural violation among the District's cumulative procedural errors. And he ignored that R.H.'s parents were misled about the efficacy of the District's programming with these inflated progress reports. The Court owes no deference to the SRO where it disregarded contrary evidence without explanation.

**b. Procedural Violation: Failing to undertake necessary tests.**

The District failed to undertake necessary testing.[61] Among the key testing omissions, the District failed to evaluate R.H.'s seizure history and how it affected her educational performance and access. The IDEA includes in its definition of "Related Services," "medical services… for diagnostic and evaluation purposes."[62] The District should have evaluated R.H.'s seizures. Instead, Parents had to undertake testing privately, and through private testing confirmed that R.H. has a rare variant in the ATP1A3 gene.[63] Dr. McDonough found that R.H. presented with symptoms correlating to this disorder (seizures, auditory and ocular dysfunction), meaning the District had cause to investigate but failed to do so.[64]

The District also failed to evaluate R.H. for suspected developmental visual problems, again leaving Parents to do so.[65] Developmental Optometrist Dr. Michele R. Bessler testified that R.H.'s visual problems were developmental – always present.[66] The IDEA requires districts to "[u]se a variety of assessment tools and strategies to gather relevant functional, ***developmental***, and academic information about the child."[67] Related services include "developmental…

---

[61] I-9-10.
[62] 20 U.S.C. §1401(26)(A).
[63] PE73-89.
[64] T1621:20-1623:18.
[65] I-24-25.
[66] T1238:415.
[67] 34 C.F.R. § 300.304(b)(3) (emphasis added).

supportive services,"[68] and defines "child with a disability" in part as a child with "visual impairments."[69] It was a serious procedural violation not to evaluate R.H. for visual deficits.

The District also failed to evaluate R.H. for audiological delays. Audiologist Dr. Donna Geffner testified that school districts on Long Island regularly contract with her to administer evaluations and provide services.[70] Because the District failed to evaluate R.H. for audiological deficits, Parents were again compelled to pay for a private evaluation.[71] Geffner found that R.H.'s "auditory comprehension is impaired and significantly below average."[72] She made several educational and evaluative recommendations that would have come years earlier but for the District's failure to act on signs of R.H.'s deficit.[73]

The delay in learning the results of these evaluations prevented Parents and the CSE from understanding the underlying causes for R.H.'s academic deficits and therefore prevented the CSE from offering appropriately tailored programs for her. The SRO erred in excluding consideration of these evaluations on the grounds that they took place after the August 2022 CSE meeting.[74] The Supreme Court has made clear that parents are permitted to hire experts to prove their cases.[75] Perhaps the only way a parent can prove that a district failed to evaluate their child comprehensively is to introduce a private evaluation undertaken after the fact. A district should not benefit from a rule excluding evidence that should have been before the CSE, but which the CSE negligently failed to obtain.

---

[68] 20 U.S.C. § 1401(26)(A).
[69] 20 U.S.C. § 1401(3)(A)(i).
[70] T1311:3-14.
[71] DE177-87.
[72] DE185.
[73] DE185-87.
[74] SD-27.
[75] *Schaffer v. Weast*, 546 U.S. 49, 60-61 (2005) ("IDEA thus ensures parents access to an expert who can evaluate all the materials that the school must make available, and who can give an independent opinion. They are not left to challenge the government without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition.").

Because the SRO did not consider these omissions to be procedural violations, again, he failed to consider their part of a cumulative effect along with the District's other procedural violations. But they prevented the CSE and parents from understanding R.H.'s needs and contributed to her lack of progress.

### c. Procedural Violation: Failure to administer a functional behavior assessment (FBA).

The IHO correctly noted that R.H. engaged in behaviors that impeded her education, but the District failed to administer a functional behavior assessment (FBA) to understand the causes of her behaviors, and also failed to create a Behavior Intervention Plan (BIP) to address those behaviors.[76] As she explained, the District "readily" could have offered an FBA but failed to do so. The Second Circuit has explained the significance of failing to do an FBA: the CSE and reviewing courts *don't know what they don't know*:

> The failure to conduct an adequate FBA is a serious procedural violation because it may prevent the CSE from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all. As described above, such a failure seriously impairs substantive review of the IEP because courts cannot determine exactly what information an FBA would have yielded and whether that information would be consistent with the student's IEP.

> The entire purpose of an FBA is to ensure that the IEP's drafters have sufficient information about the student's behaviors to craft a plan that will appropriately address those behaviors…. The failure to conduct an FBA will not always rise to the level of a denial of a FAPE, but when an FBA is not conducted, the court must take particular care to ensure that the IEP adequately addresses the child's problem behaviors.[77]

The SRO dismissed this serious violation by bringing it under *R.E.*'s rare carve-out for cases where the "IEP adequately addresses the child's behaviors."[78] But rather than take care that

---

[76] I-8-9. The failure to write a BIP is a substantive IDEA violation.
[77] *R.E.*, 694 F.3d at 190 (internal citations and quotes omitted).
[78] SD-22-24.

R.H.'s IEPs addressed her behaviors, the SRO explained away as innocuous, one-by-one, serious interfering behaviors that R.H.'s teachers and related service providers observed for years.[79]

The SRO found that because R.H. was not a "behavior problem" for her peers that she did not need an FBA or BIP.[80]  But the IDEA states that schools must address behaviors that "*impede the child's learning* or that of others."[81]  Whether R.H. was externally disruptive had nothing to do with the fact that her behaviors plainly *impeded her own learning*.  As noted below, the SRO found that R.H.'s behaviors – her "attention, focus and stamina concerns" – were so problematic that they caused her reading ability to fluctuate.[82]  These were the very concerns that Dr. McDonough testified should have been analyzed with an FBA and addressed through a BIP.[83]

The SRO's decision to excuse the District's failure to do an FBA led him not to consider that serious procedural violation as part of its cumulative procedural violations. But, like its other omissions and errors, this one prevented the CSE and Parents from understanding how R.H.'s behaviors contributed to her academic struggles.  This, in turn, led the CSE not to create a BIP to address her behaviors – a serious substantive violation.  The SRO should have found that the absence of an FBA was a serious procedural violation that led directly to substantive deprivation, not a minor technicality easily excused.  The Court need not defer to the SRO's poor reasoning.

### d.  Procedural Violation: The IEPs contained inaccurate, unmeasurable goals.

The IHO correctly found that the District's IEP goals were not data-driven, measurable, or appropriately ambitious, a serious violation.[84]  As the Supreme Court said in *Endrew F.*: "*every child should have the chance to meet challenging objectives.*"[85]  The Second Circuit has explained

---

[79] SD-23-25.
[80] SD-24.
[81] 34 C.F.R. §300.324(a)(2)(i).
[82] SD-32.
[83] T1628:22-1629:20.
[84] I-10-13.
[85] *Endrew F.*, 580 U.S. at 402.

that an IEP must "establish[] annual and short-term objectives for improvements… and describe the specially designed instruction and services that will enable the child to meet those objectives."[86]

The SRO used an inapplicable standard in assessing R.H.'s IEP goals: "[C]ourts generally have been reluctant to find a denial of FAPE on the basis of an IEP failing to sufficiently specify how a student's progress toward his or her annual goals will be measured when the goals address the student's areas of need."[87] But the SRO omitted that several of the cases he cited stand for a different proposition: a district can overcome vague goals *only by showing that the IEP had other, more specific ways to measure the child's progress* (*i.e.*, measurable and specific short-term objectives for each goal or teacher testimony that they had collected more specific data). For example, in *D.A.B.*, the court wrote: "When an IEP contains a significant number of specific short-term objectives to supplement otherwise broad annual goals, the vagueness of the annual goals alone will not rise to the level of the denial of a FAPE."[88] It then cited the 96 short-term objectives accompanying its 17 annual goals, all of which spanned 16 pages of the IEP.[89]

Similarly, in *A.D. v. New York City Department of Education,* the court agreed that the IEP's goals were sufficiently measurable, but only because *each had more particular, objectively measurable short-term objectives or goals*.[90] The SRO cited the seminal *M.H.* decision several times, but he disregarded the passage where that court deemed the SRO's decision "poorly reasoned," "conclusory" and not "thorough and careful" for failing to scrutinize the IEP's goals and short-term objectives.[91]

---

[86] *M.H.*, 685 F.3d at 224 (citing *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507-08 (2d Cir. 2006)).
[87] SD-22 (citing, *inter alia, D.A.B. v. N.Y.C. Dep't of Educ.*, 973 F. Supp. 2d 344, 359-60 (S.D.N.Y. 2013)).
[88] *D.A.B.*, 973 F. Supp. 2d at 359 (emphasis added).
[89] *Id.* at 353, 358-60 (internal references and corrections omitted).
[90] *A.D.*, 2013 WL 1155570, *10 (S.D.N.Y. March 19, 2013).
[91] *M.H.*, 685 F.3d at 247.

Unlike in *D.A.B.* and *A.D.*, R.H.'s IEPs contained no short-term objectives to cure its vague goals. In fact, for both IEPs, all 12 goals fit on just two pages. As explained, *supra*, the IEPs' present levels and progress tracking/reporting were fundamentally unreliable, which meant these goals were not grounded in sufficiently accurate information to define appropriate progress for R.H. over the ensuing school year.

### 1. Study Skills Goal

The stark contrast in how the IHO and SRO evaluated R.H.'s study skills goals illustrates why the Court should defer to the IHO, not the SRO. Only the IHO's analysis was "thorough and careful."[92] The IHO rejected the fourth grade IEP's study skills goal – to maintain attention for 10 minutes – because it was patently unrealistic given R.H.'s documented inability even to sit in a chair for ten minutes.  She did not credit the third grade progress report's claim that R.H. had achieved her study skills goal that year.[93] She noted that the goal included no baseline from which to measure attention, focus, or stamina.[94] The record as a whole indicated that R.H. needed frequent prompting and redirection and was "easily fatigued and distracted."[95] There was no objective data from which to evaluate her study skills progress.[96] In sum, nothing about the goal complied with basic IDEA requirements.

The SRO rejected the IHO's finding but failed to grapple with the facts she cited.[97] Instead, he cited the same progress report that the IHO rejected, but credited its claim that R.H. had achieved her "annual goal of maintaining attention on task during class lessons and assignments."[98] He simply ignored the more specific evidence, which the IHO expressly cited, to refute that

---

[92] *Id.* at 248.
[93] I-11 (citing DE195).
[94] I-11.
[95] *Id.*
[96] *Id.*
[97] SD-21.
[98] *Id.* (citing DE195).

claim.[99]  The IHO queried the District's witness at length on this goal and cited that colloquy to conclude that R.H. could not sit in a chair, let alone pay attention, for ten minutes.[100]  The SRO ignored this colloquy.

 In cherry-picking evidence and disregarding the IHO's careful evaluation of the District's witness, the SRO was not engaging in policymaking or demonstrating educational expertise; he was giving an imbalanced narrative to support an incorrect conclusion.  The *M.H.* court rejected similarly flawed analysis as a "conclusory" endorsement of IEP goals and a troubling failure to point to contrary evidence.[101]

For fifth grade, the District removed R.H.'s study skills goal. The IHO held that it was "not plausible" that that she no longer needed one.[102] The District's speech language pathologist, Ms. Mock, testified that R.H.'s ability to attend to lessons was inconsistent, had negatively affected her performance, and was difficult to measure:

> [R.H.'s] attention was very, very impactful on her therapy sessions and there were times that she did achieve them and then there would be two weeks later she would get a fraction correct that she did the week before or two weeks before so it was so inconsistent. It was obvious when she was attending that she could attain the goals and then when she was distracted she couldn't. I don't know if that answers your question but it was just inconsistent. It's hard to measure when attention comes into play.[103]

---

[99] SD-21.

[100] T1142:17-1146:5.

[101] *Id.* at 249. *See also S.B. v. N.Y.C. Dep't of Educ.,* No. 15-CV-1869, 2017 U.S. Dist. LEXIS 160056, *37-38 (E.D.N.Y. Sep. 28, 2017) (rejecting SRO's conclusory analysis, stating: "Regarding the IEP goals, the SRO cites to the pages of the IEP on which the goals appear and states, without more, that the 'goals indicated in the IEP are appropriate and specifically address her deficits…. [W]hile the Court generally defers to the specialized knowledge and educational expertise of the administrative reviewers on these types of questions… ***there is no indication that these holdings are grounded in that expertise***.") (Emphasis added).

[102] I-18.

[103] T732:25-733:17.

The IHO asked R.H.'s teacher why the goal was removed. She answered that tracking and measuring attention is difficult because "everybody has good days and everybody bad days."[104] The teacher then wondered whether R.H. or *any* 4th grader could have attended to lessons for 10 minutes, adding that were she to write such a goal it would be for the student to attend for "three minutes, five minutes max."[105] As discussed below, the SRO himself cited R.H.'s "attention, focus and stamina concerns" to excuse her fluctuation in reading between second and fourth grades.[106]

Rather than grapple with District testimony showing that R.H. had not achieved her study skills goal, the SRO excused the removal of that goal from the 5th grade IEP. He credited R.H.'s progress report, which stated, citing no data, that, by the end of June 2022, R.H. was still "expected to achieve her study skills annual goal of maintaining her attention to task for 10 minutes."[107] It is unclear whether and why the SRO interpreted this "expected" achievement as a completed achievement – especially where the record as a whole suggests it was unlikely that any child could meet that goal.

The Court should not defer to the SRO's unsupported findings over the IHO's more thorough and careful reasoning. And this same pattern applies to most of the other goals.

### 2. Reading Goals.

R.H.'s fourth grade reading goals were inadequate. Her decoding goal (goal 2) – to apply learned decoding skills to a text at her reading level – was too vague to be meaningful.[108] Her

---

[104] T885:2-6. Curiously, the SRO cites this exact testimony – that attention is difficult to measure – to justify the removal of the goal. SD-22.

[105] T885:21-886:16.

[106] SD-32. As discussed in connection with reading, the SRO's causal inference – that R.H.'s reading fluctuated due to her attention problems -- causal connection has no basis in the record and contradicts established science of reading. T1710:21-1711:4 (Dr. McDonough testifies that once you have orthographically mapped a word, "you always have that word.").

[107] SD-22 (citing DE203).

[108] I-11.

"sight word" goal (goal 3) did not have a baseline.[109]  The comprehension goal for R.H. to retell a story (goal 4) did not say whether she would read the story or if it would be read to her – a factor that was especially important in monitoring her reading progress given the minimal reading skill she had shown to date.[110]

R.H.'s fifth grade reading goals were also inadequately tailored to her needs. Her end of year fourth grade report card showed that she scored '1' – not achieving the Standards for this marking period – in every reading category.[111]  This was apparent regression from third grade, where she scored '2' in almost each category and reportedly "improved her decoding skills along with her comprehension."[112] It is impossible to square R.H.'s straight 1s with her fourth grade progress report, which indicated that she was progressing satisfactorily in all three reading goals.[113]

The fifth grade goals were also inadequately tethered to identified deficits. Dr. McDonough explained that the goals' stated criteria for success in comprehension – 80% success over eight weeks – would still mean that R.H. was a nonfunctional reader.[114] The goals were indeterminate, requiring that she read 10 single-syllable words with long vowels (Goal 1) and welded sounds (Goal 2) without any detail about which long vowels and welded sounds she should learn. A new teacher, unfamiliar with R.H., would not know what sounds R.H. needed to work on after reading this goal.  Her present levels indicated that she had learned the 'th' sound and short vowel sounds;[115] however, her May 16, 2022 running records form shows errors reading the short-vowel

---

[109] *Id. See E.H. v. N.Y.C. Dep't of Educ.*, 164 F. Supp. 3d 539, 555 (S.D.N.Y. 2016) (reversing the SRO and reinstating the IHO decision where, among other things, goals were not based on accurate present levels).
[110] *Id.*
[111] DE215.
[112] DE211-12. That end of third grade report was itself implausible in light of evidence showing that R.H. had no functional reading ability at the start of fourth grade.
[113] DE204.
[114] T1665:1-13; DE66.
[115] DE63.

words 'washed' 'was' 'can't' and 'give.' She also misread 'the' twice.[116]  And as the IHO noted, she was given visuals for Goal 3 – to verbally summarize a text using a proper sequence.[117] Visuals made it very difficult to know if she was reading or interpreting pictures. Finally, like her fourth grade reading goals, the fifth grade goals had no baselines.[118]

Rather than engage the IHO's reasoning, the SRO listed the IEP's reading goals without analysis, then offered the conclusory finding that they addressed R.H.'s identified needs.[119] The *S.B.* court rejected precisely such conclusory non-analysis: "[T]he SRO cites to the pages of the IEP on which the goals appear and states, without more, that the 'goals indicated in the IEP are appropriate and specifically address her deficits….'"[120]  And when discussing the IHO's concerns about the IEP goals, the SRO skipped her concerns about reading entirely.[121]  A "thorough and careful" analysis requires analysis, not conclusory findings. The Court should not defer to the SRO's superficial analysis of R.H.'s reading goals.

### 3.  Writing Goals.

Analyzing R.H.'s writing goals, the IHO noted that while the first (goal 5) was to write a 4-sentence paragraph, R.H. had not yet shown she could write, stay on topic, or even copy a sentence, let alone formulate one of her own.[122] This analysis is consistent with the school's own standardized assessment, on which R.H. earned a raw score of zero (1st percentile) in sentence composition.[123]  Regarding the second writing goal (goal 6), to edit and add details to a paragraph, there was no specified quality or quantity of details to add.[124]

---

[116] DE326-29.
[117] I-18 (citing DE66).
[118] DE66.
[119] SD-20.
[120] *S.B.*, 2017 U.S. Dist. LEXIS 160056, at *37-38.
[121] SD-21.
[122] I-11.
[123] DE118-19.
[124] I-11.

The SRO again cherrypicked evidence to reject the IHO's analysis. He selectively cited parts of the same evaluation report as the IHO: "[T]he February 2021 reevaluation report stated that the student was able to write a sentence with accuracy including the key word and therefore there is no reason to suggest the May 2021 IEP's annual goal involving writing a four-sentence paragraph was not an appropriate next step."[125] But he ignored the report's data– scores in the 1st percentile – which gave a strong "reason to suggest" that the four-sentence goal was far too advanced for R.H. The SRO was not free to ignore objective data where it did not fit his narrative.

### 4. Math goals.

The IHO correctly noted that R.H.'s first math goal for fourth grade (goal 7), to add 2-digit numbers, bore no relation to her math level; at that time, R.H. relied on drawing dots and counting them to perform math operations.[126]   More confusingly, the same goal was in R.H.'s May 2020 IEP and the District reported that it expected her to achieve it by the end of 2020-21.[127]  Either the District was overstating her math progress in third grade or it was offering a wholly unambitious goal for fourth grade.

At the end of fourth grade, June 2022, according to her IEP progress report, R.H. was again reportedly expected to achieve her 2-digit addition goal.[128] But her general education report card told a different story, assigning her '1s' in every math category, including "uses multiplication, division, subtraction and addition with whole numbers."[129]

In August 2022, the District tacitly conceded her lack of progress by writing essentially the same math goal four fifth grade: to add 2 digit numbers with fluency.[130] Dr. McDonough's

---

[125] SD-21.
[126] I-12 (citing DE116).
[127] DE11, DE198. The third grade IEP included a subtraction goal, which was removed for fourth grade. DE11.
[128] DE206.
[129] DE215.
[130] DE66. Although this goal removes the qualification "without regrouping," there is no evidence that R.H. learned 2-digit addition without regrouping.

standardized testing in the fall of 2022 confirmed that R.H. scored in the 'extremely low" range in math problem solving and math fluency.[131]

The second math goal for fourth grade (goal 8), to "identify what operation a key word represents," did not specify which operations she was to identify.[132]  And much like the first goal, it rephrased her third grade goal.[133]

The SRO again listed these goals but did not truly analyze them.  His half-hearted analysis was to cite two-sentences of from R.H.'s third grade teacher, who testified: (i) that they had carried over the third grade math goal into fourth grade because R.H. had not met her 2-digit addition goal, contradicting her year-end progress report, which said that R.H. was "expected to achieve the goal,"[134] and (ii) that they modified the second goal slightly because R.H. "was able to identify the key word in a word problem but was not able to identify the operation."[135] The SRO did not try to explain *why* these goals were "appropriately ambitious" next steps for R.H.

### 5.  Motor Skills goals.

The IHO explained how R.H.'s motor skills goals were unmeasurable or poorly matched to her reported skills. R.H.'s first motor skills goal was to "improve" her visual perceptual skills by copying a design, but with no proposed measurement of improvement.[136] The second goal – to be able to sit upright for 10 minutes – undermined the District's (and SRO's) dubious claim the she achieved the goal of attend to a lesson for 10 minutes.[137] The third goal – to complete lower body exercises – was not measurable.[138] Her fourth and fifth motor skills goal again did not include

---

[131] DE1164.
[132] I-12.
[133] DE11; DE23.
[134] DE198.
[135] SD21 (citing T88:9-17)
[136] I-12.
[137] *Id*.
[138] *Id*.

measurement criteria.[139] Her sixth motor skills goal – to use far-point copying with appropriate spacing and line placement – omitted that she needed large, spaced paper for this skill.[140]

Again, rather than analyze these motor skills goals, the SRO merely listed them and declared that they "target[ed] the student's needs."[141]  The Second Circuit rejected such conclusory determinations. And because he did not truly analyze the problems with these goals, he offered no consideration of how their inaccuracy and vagueness prevented R.H.'s parents from gaining any realistic understanding of her deficits and potential for growth. He did no analysis of the cumulative effect of the District's many procedural violations, and he did not consider how the poor goals contributed to that cumulative effect.

**e.  Cumulative effect of the District's many procedural violations.**

Cumulatively, the District's procedural violations left the CSE and R.H.'s parents without a complete picture of her intellectual strengths and deficits, of her academic present levels and progress, and of how her disability impeded her educational access and performance. The result of these errors, individually and cumulatively, was that the District created a series of IEPs that never properly addressed R.H.'s academic and functional needs, which in turn prevented her from making meaningful progress.

Rather than do a required cumulative analysis, the SRO dismissed each individual procedural violation, one by one, always – stubbornly – drawing inferences for the District.  The District's failed, incomplete processes were borne of carelessness and inattention – falling well below the IDEA's procedural standard for affording R.H.'s parents a fair opportunity to participate

---

[139] *Id.*
[140] *Id.*
[141] SD-21.

meaningfully in educational decisionmaking for her.  The Court should find that the District's procedural violations, individually and cumulatively, denied R.H. a FAPE.

## 2. Substantive Violations: The District's substantive violations denied R.H. a FAPE.

Courts must examine whether an IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits. Substantive inadequacy automatically entitles the parents to reimbursement.[142] Here, the IHO properly held that the District committed several substantive violations.

### a. The District did not offer R.H. an appropriate reading program.

The IHO correctly held that the District did not offer R.H. an appropriate reading program and that, as a result, R.H. made little progress in reading.[143]  She noted that while the District claimed to use elements of the Wilson Reading program for R.H., it produced no written evidence of having done so.[144] Despite R.H. struggling in reading for years, the CSE never showed that it understood what reading strategies could work for her. Quoting New York state guidance (and long-standing federal case law), the IHO held that the District neglected its duty to "avoid reinstituting programs that have not proven effective in the past."[145]

During the hearing, the District failed to prove that it used any appropriate reading program for R.H. The IHO concluded: "The District did not offer an individualized and specialized reading program."[146]  R.H.'s IEPs did not specify the daily frequency and duration of reading instruction,

---

[142] *R.E.*, 694 F.3d at 190 (quoting *Rowley*, 458 U.S. at 206-07; *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d. Cir. 2005)) (quotes omitted). As noted above, *Endrew F.* raised *Rowley's* substantive standard.
[143] I-15-16.
[144] I-16.
[145] I-20 (citing NYSED 1999 Guidelines on Implementation of Specially Designed Instruction).
[146] I-16.

and they placed R.H. in too large a class for her to receive adequately intensive instruction.[147] R.H.'s third grade teacher admitted that R.H. needed more help than she could provide.[148]

The District's failure to offer R.H. an appropriate reading program had a predictable outcome: She never learned to read, as discussed above. By the end of third grade (2020-21 school year), she was purportedly reading at Level G, the expected level for fall of first grade. However, as discussed above, she was reading level D texts the following fall. By the end of fourth grade, she was back reading level G texts. Given her consistent failure to make progress from year to year, the District had a legal obligation to offer a reading program better tailored to her needs.

The SRO erred factually and legally in rejecting the IHO's analysis of the District's reading program. *Factually*, he erred by rejecting the IHO's core premise: R.H. did not make progress in reading. Rather than grapple with this finding, he credited the District's progress report,[149] which, as discussed above, represented that R.H. – a fourth grader who could not read "what" "big" or "little" – made meaningful progress in decoding. The Court owes no deference to this clearly erroneous factual conclusion.

The SRO also erred factually by explaining away R.H.'s stagnation and fluctuation in reading through groundless speculation about its cause:

> I further note that, according to the IHO's grade level descriptors, the student's instructional level "fluctuations" between levels "C" and "G" using Fountas and Pinnell indicators during the 2020-21 and 2021-22 years represented a range from kindergarten to mid first grade, ***which was not necessarily an unexpected range of performance for a student with attention, focus and stamina concerns.***[150]

---

[147] DE12 (2020 IEP lists recommended special education programs and services as "special class."); DE25 (2021 IEP, same); DE67 (2022 IEP, same)
[148] T149:8-16.
[149] DE202-09.
[150] SD31-32 (emphasis added).

Nothing in the record supports the SRO's speculation that R.H.'s "attention, focus and stamina" caused fluctuation in her reading. While R.H. most certainly struggled with attention, focus and stamina, there is no evidence linking those struggles with *fluctuation*. To the contrary, Dr. McDonough gave unrebutted testimony that when a child masters a sight word, it is orthographically "mapped" in her brain and she should never lose it.[151] The District did not try to rebut this well-accepted expert opinion. And the SRO was not free to disregard it. The Court owes the SRO no deference on this speculative, scientifically invalid factual finding.

*Legally*, the SRO improperly excused the District's years-long failure to offer R.H. adequate reading programming. He disregarded New York's August 2018 Q&A for "Students with Disabilities Resulting from Dyslexia, Dysgraphia and Dyscalculia" (Q&A).[152] The Q&A states, in relevant part: "The specially designed instruction provided to each student should be based on the information documented in the present levels of performance and tailored to his or her individual, disability-related needs."[153]  It continues, echoing the IHO's own language: "When discussing a student's present levels of performance, the CSE should review what prior instructional methods and strategies have been utilized with the student ***to avoid reinstituting programs that have not proven effective in the past***."[154]

Rather than hold the District to this specific standard, the SRO cited a less specific New York Q&A addressing IEP procedures generally to hold that the District's offer of "specific reading instruction" in a "12:1+1 special class" was a sufficiently detailed description of a reading

---

[151] T11709:3-1711:8 (McDonough explained in response to the IHO's question: "[W]hen a person acquires a word in their reading vocabulary, like a whole word, it's called orthographic mapping. So basically, once you have a word, once you recognize that word, it's what we call orthographically mapped. You always have that word. So, in the acquisition of basic reading skills, there really shouldn't be regression if the skill was taught to mastery.").
[152] The Q&A is attached as Exhibit B to the Complaint. *See* ECF 1-4.
[153] *Id*. at 6.
[154] *Id*. (Emphasis added); I-20.

program.[155] But the phrase "specific reading instruction" is an empty vessel – it gave R.H.'s parents no information about her program. *R.E.* teaches that a district cannot use "retrospective" testimony to rehabilitate indeterminate programming in an IEP.[156] The rationale is that parents have a "considerable reliance interest" in the text of an IEP when they decide whether to accept it or to reject it and enroll their child in private school.[157] Here, the SRO's actions were more inequitable to R.H.'s parents than if the District had been allowed to offer retrospective testimony: he declared that the all-purpose term "specific reading instruction" – which the District included in all of her 2021 and 2022 IEPs[158] – meant whatever it needed to mean to pass muster under the IDEA, year after year. R.H.'s parents had no way to know from the text of the August 2022 IEP whether or how the District was going to change its reading programing for R.H. The SRO completely relieved the District of its burden of proof by endorsing this empty terminology.

In sum, the SRO had no factual or legal basis to find that the District proved that R.H. made progress in reading or that it offered her an appropriate reading program.

> **b. The District's 12:1:1 placement for R.H. was inappropriately large. The District chose it because there was no viable alternative.**

The Second Circuit has held that that if there is a "clear consensus" about a child's needs, her IEP team must "provide services consistent with that consensus."[159] It added: "This remains true whether the issue relates to the content, methodology, or delivery of instruction in a child's IEP."[160] The clear consensus among the witnesses was that R.H.'s attention and focus issues, and her need for frequent prompting, necessitated that she be in a small classroom – smaller than the

---

[155] SD-28-29. This general Q&A is attached as Exhibit A to the Complaint. ECF 1-3.
[156] *R.E.*, 695 F.3d at 186.
[157] *Id.*
[158] DE25 (May 2021 "Specific Reading Instruction"); DE38 (May 2022 same); DE52 (June 2022 same); DE67 (August 2022 same).
[159] *A.M.,* 845 F.3d at 543 (quoting *Rowley*, 458 U.S. at 207); *C.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 81 (2d Cir. 2014)) (quotes and citations omitted).
[160] *A.M.,* 845 F.3d at 543.

12:1:1 classroom proposed by the District.  In *C.F. v. New York City Department of Education*, the court held that where, as here, there is agreement about the need for a specific classroom size, the CSE must provide such a placement.[161]

Here, it became clear at trial that the District offered R.H. placement in a 12:1:1 classroom not because it was appropriate, but because it had no appropriate placement available.  The District did have a smaller, 8:1:1 classroom available, but Bridget Karis, the District's Director of Pupil Services, testified that it was for students with far greater deficits:

> A.  … R.H. presents as a child who is very social, engaging. She is verbal. She can make progress in a small class setting. The next smallest class setting that we would have is an 8-1-2. That is for students with significant disabilities who are alternatively assessed. [sic] … [W]e didn't feel that that was an appropriate placement for her and, on the contrary to a least restrictive environment which would be a 15-1-1 or integrated co-teaching, we felt that those class sizes would be too large or move at too fast a pace for R.H.[162]

Every witness agreed that R.H. needed individualized attention. School psychologist Elyssa Meyer explained how R.H. struggled even in a 1:1 testing setting.[163] Occupational therapist AnnMarie Boles testified that R.H. "always needed prompts… She has delays with her attention, her focus, so she definitely needed, you know, structure session."[164]  SLP Mock noted: "[T]he largest thing that we saw impacting her was her ability to attend. If a child can't attend, it's very difficult for them to grasp the concept and to be able to follow through with the expected task and that was the overlying issue as far as my services."[165] Dr. McDonough testified in response to the IHO's direct question, that a 12:1:1 classroom would not allow R.H. to access the curriculum.[166] Audiologist Donna Geffner testified, in response to the IHO's questions, that R.H.'s auditory

---

[161] *C.F.*, 746 F.3d 68, 81 (2d Cir. 2014).
[162] T268:7-269:2.
[163] T607:19-608:8.
[164] T417:16-22.
[165] T646:10-16.
[166] T1713:9-13.

processing deficits required that she be placed in a small quiet classroom with individualized instruction – even in a 1:1 environment she struggled to discriminate sounds.[167]

The SRO did not directly address the IHO's finding that the 12:1:1 class was inappropriate. But where, as here, there is a "clear consensus" that a child needs a certain size classroom, it is a denial of FAPE for the CSE to ignore that consensus. The Court should find that the failure to offer R.H. placement in an appropriately sized class was a denial of FAPE.

## IV. CONCLUSION

Ultimately, year after year, the District offered R.H. an unproven curriculum and placed her in classrooms too large for her to succeed. These substantive violations flowed from and highlight the District's serious procedural violations, which individually and cumulatively denied R.H.'s parents the ability to understand and participate in R.H.'s educational decisions.  The SRO failed to hold the District to its procedural and substantive burdens.

**WHEREFORE**, for the reasons stated in this memorandum, Plaintiffs respectfully request that this Court GRANT their Motion for Judgment on the Administrative Record.


Dated: February 4, 2026                           Respectfully submitted,


Richard F. Corrao                          Benjamin J. Hinerfeld
**Law Office of Susan J. Deedy &**         **Law Office of Benjamin J. Hinerfeld**
**Associates**                             9 Stoddard Street
1600 Stewart Avenue, Suite 609             Plymouth, MA 02360
Westbury, New York 11590                   1528 Walnut Street, Suite 1100
(516) 221-8133                             Philadelphia, PA 19102
Rcorrao@Susandeedylaw.com                  447 Broadway 2nd Floor
                                            New York, NY 10013
                                           (508) 591-0385
                                           Ben@hinerfeldlaw.com

---

[167] T1371:3-15.