**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____X

**T.H. and E.H.** individually, and on behalf of their child,
R.H., a minor,                                                    Case No. 2:25-150-NJC-JMW

Plaintiffs,

     -against-                                    Individuals with Disabilities
                                                                 Education Act;
                                                                 N.Y. Educ. Law § 4401 _et seq_.
**West Hempstead Union Free School District**

Defendant.
_____X


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**


Richard F. Corrao                          Benjamin J. Hinerfeld
**Law Office of Susan J. Deedy &**          **Law Office of Benjamin J. Hinerfeld**
**Associates**                             9 Stoddard Street
1600 Stewart Avenue, Suite 609             Plymouth, MA 02360
Westbury, New York 11590                   1528 Walnut Street, Suite 1100
(516) 221-8133                             Philadelphia, PA 19102
Rcorrao@Susandeedylaw.com                  447 Broadway 2nd Floor
                                            New York, NY 10013
                                           Ben@hinerfeldlaw.com

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................i

TABLE OF AUTHORITIES .........................................................................................ii

I.  PRELIMINARY STATEMENT ...........................................................................1

II. STANDARD OF REVIEW ....................................................................................2

III. ARGUMENT .........................................................................................................3

    **1.  The SRO did no analysis to hold that the District offered R.H. a FAPE. The Court does not have to defer to an SRO decision without analysis** ......................3

    **2.  The SRO's selective use of the record undermines his finding that R.H. did not need a functional behavior assessment (FBA)** ...........6

    **3.  The SRO erred in finding that the District's IEPs were substantively appropriate. The District never proved that it provided R.H. intensive reading instruction** ......9

    **4.  The SRO erred in holding that the District's OT interventions were sufficient to meet R.H.'s vision-related needs** ...................16

IV. CONCLUSION ....................................................................................................30

# TABLE OF AUTHORITIES

*B.R. v. N.Y.C. Dep't of Educ.*,
910 F. Supp. 2d 670 (S.D.N.Y. 2012) ...................................................................3

*Cerra v. Pawling Cent. Sch. Dist.*,
427 F.3d 186 (2d. Cir. 2005) ...............................................................................2

*C.L. v. N.Y.C. Dep't of Educ.*,
2013 WL 93361 (S.D.N.Y. Jan. 3. 2013) ...........................................................15

*Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*,
580 U.S. 386 (2017) .....................................................................................*passim*

*F.O. v. New York City Department of Education*,
976 F. Supp. 2d 499 (S.D.N.Y. 2013) ..........................................................*passim*

*L.R. v. N.Y.C. Dep't of Educ.*,
193 F. Supp. 3d 209 (2016) .............................................................................1, 5

*M.H. v. N.Y.C. Dep't of Educ.*,
685 F.3d 217 (2d Cir. 2012) ........................................................................*passim*

*P. v. W. Hartford Bd. of Educ.*,
885 F.3d 735 (2d Cir. 2018) ................................................................................3

R.B. v. N.Y.C. Dep't of Educ.,
589 Fed. Appx 81 (2d Cir. 2013) .......................................................................11

S.B. v. N.Y.C. Dep't of Educ.,
2017 U.S. Dist. LEXIS 160056 (E.D.N.Y. Sep. 28, 2017) ...................................2

*S.F. v. New York City Dep't of Educ.*,
2011 WL 5419847 (S.D.N.Y. Nov. 9, 2011) ........................................................4

*W.S. v. Rye City Sch. Dist.*,
454 F. Supp. 2d 134 (S.D.N.Y. 2006) ..................................................................2

## STATUTES AND RULES

20 U.S.C. § 1400, *et seq*. (Individuals with Disabilities Education Act) .............................*passim*

N.Y. Educ. Law § 4401(c)...............................................................................................3

8 NYCRR § 200.6(b)(6) .................................................................................................15

## I.  PRELIMINARY STATEMENT

R.H. made almost no progress in District placements for several years, leading her parents to withdraw her and place her at Vincent Smith School, a private school for children with disabilities.  After a 13-day Due Process hearing, the IHO agreed with Parents that the District's IEPs were inadequately written and she awarded Parents tuition reimbursement.  The SRO reversed, holding that the IHO got *everything* wrong.  In doing so, however, he made arguments the District did not make, selected evidence exclusively favoring the District, and disregarded abundant evidence supporting Parents.

Parents now ask the Court to consider whether the SRO's decision – which gave no quarter in its total takedown of the IHO's decision – was thorough and well-reasoned.  For the reasons stated in their opening brief and here, they ask the Court to find that it was not, and to vacate it.

## II.  STANDARD OF REVIEW

As Parents explained in their opening brief, the standard for a court reviewing an SRO opinion – to decide whether it should defer to the SRO – boils down to ensuring that the SRO considered the entire record and gave a thorough and well-reasoned explanation for departing from the IHO's decision.[1]  Although the District cites similar caselaw as Parents, it argues, in effect, that whenever the SRO discusses something educational, the Court must defer to it.[2]  As Parents explained in their opening, this grossly oversimplifies judicial review, as a thorough and well-reasoned decision requires reasons, not summary pronouncements that the child received a FAPE.[3]

For example, rejecting the SRO's analysis, the Second Circuit in *M.H.* explained:

---

[1] Mem. of Law in Support of Plaintiffs' Mot. for Summary Judg. (PLMOL) at 3-8.
[2] Mem. of Law on Behalf of Defendant(s) West Hempstead Union Free Sch. Dist. in Support of the Defendant's Motion for Judgment on the Administrative Record (Dist. Br.) at 14-15.
[3] PLMOL at 7 (citing *L.R. v. N.Y.C. Dep't of Educ.*, 193 F. Supp. 3d 209, 215 (2016)).

> The SRO… did no more than state summarily that the goals comprehensively addressed the student's needs…. ***The SRO's conclusory statement does not evince thorough and well-reasoned analysis that would require deference.***[4]

When the SRO makes rulings without reasoning, he does not earn the Court's deference.

Much of the parties' dispute therefore centers around whether the SRO – (1) considered all the evidence, and (2) explained *why* that evidence supported his rulings. One court explained the problem Parents face here – where the SRO privileges one party's facts over the other's without explanation or justification:

> ***[I]t is difficult to characterize the SRO's stubborn reliance on the DOE's witnesses, and failure to account for other witnesses' conflicting testimony, as "weighing" anything***. "[T]he SRO's decision reveals that, far from merely weighing evidence differently, the SRO failed to distinguish, explain, or otherwise analyze certain conflicting evidence in his analysis."[5]

As explained in Parents' opening, the SRO did not consider the whole record, chose selections from it that favored Defendant (even where Defendant did not cite those selections), and did not explain why he ignored  more compelling evidence that favored Parents.

Substantively, the District and SRO dilute the IDEA's standard of review in a subtle but important way. The District says an IEP need only "afford the student with an opportunity greater than mere trivial advancement" *and also* that the IEP must be "reasonably calculated to provide some 'meaningful' benefit."[6] But the Second Circuit has distinguished those two standards, holding that the "meaningful benefit" standard is *higher* than the "more than mere trivial advancement" standard: "This Court's decision in [*Cerra v. Pawling*] does not stand for the proposition that the IDEA is satisfied with any progress above the floor of 'trivial advancement,'

---

[4] *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 249 (2d Cir. 2012) (internal quotes omitted) (emphasis added); *S.B. v. N.Y.C. Dep't of Educ.*, 15-CV-1869, 2017 U.S. Dist. LEXIS 160056, at *37-38 (E.D.N.Y. Sept. 28, 2017).

[5] *F.O.,* 976 F. Supp. 2d 499, 514 n.9 (S.D.N.Y. 2013) (cleaned up) (quoting *W.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 145 (S.D.N.Y. 2006)); *M.H.*, 712 F. Supp. 2d at 166 n.18.).

[6] Dist. Br. at 12.  Citing *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 196 (2d Cir 2005).

2

and it should not be cited for that proposition."[7]  And the *Endrew F*. decision expressly rejected the "more than mere trivial advancement" standard: "A student offered an educational program providing 'merely more than *de minimis*' progress from year to year can hardly be said to have been offered an education at all,"[8]  adding that the proper standard is "markedly more demanding."[9]  Both the District and SRO appear satisfied with R.H. making any progress at all, *i.e.*, more than *de minimis* progress.  Neither explains how – or even says that – her program was calculated to yield appropriate progress in light of her circumstances, or a meaningful benefit.

**III. ARGUMENT**

**1.  The SRO did no analysis to hold that the District offered R.H. a FAPE.  The Court does not have to defer to an SRO decision without analysis.**

Throughout his decision, the SRO offers non-analysis. He *lists* goals, placements, and programs, and then, without meaningful explanation, declares them appropriate. For example, the District argues that the SRO properly dismissed the IHO's concerns about R.H.'s goals.[10] As Parents explained in their opening, the IHO closely scrutinized and then rejected the IEP goals as unrealistic, lacking in baselines, and premised on unreliable progress reports.[11]  The SRO then analyzed R.H.'s goals under an improperly lenient legal standard and summarily dismissed the IHO's analysis. Rather than analyze the goals, he simply listed them, credited District witnesses that the IHO had not credited, and disregarded documentary evidence the IHO cited to find that the goals were improperly written. He rarely if ever explained *why* specific goals were appropriate for R.H.; he just declared them so.

---

[7] *P. v. W. Hartford Bd. of Educ*., 885 F.3d 735, 757 n.12 (2d Cir. 2018) (citing *Cerra v. Pawling Cent. Sch. Dist*., 427 F.3d 186 (2d Cir. 2005)).
[8] *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 402-03 (2017)
[9] *Id.* at 402-03.
[10] Dist. Br. at 13 (citing SD-20-22).
[11] PLMOL at 15-24

The 2021-2022 study skills goal (Goal 1)[12] is a good example of how the SRO rejected the IHO's analysis without a good explanation and without considering the whole record. The IHO rejected Goal 1 as being too ambitious.[13] Her reasoning was that the District's own evaluations and teacher testimony showed that R.H. could not sit still in a chair for 10 minutes and needed frequent prompting to stay on task.[14] She also found non-credible a progress report that said R.H. "achieved" her prior, 2020-2021 study skills goal.[15]

The SRO summarily dismissed the IHO's finding about Goal 1.[16] Of course, he was permitted to do so – so long as he addressed all the relevant facts and engaged the IHO's reasoning. But he did neither. Instead, he chose to credit the very 2020-2021 progress report that the IHO rejected, writing: "[T]he 2020-21 school year progress report shows that by April 2021, the student had achieved an annual goal of maintaining attention on task during class lessons and assignments…."[17] He never explained why the IHO's grave concerns about that report's accuracy were unfounded. Of the two officers' analyses of the progress report, the IHO's is more complete because it views that report in the context of the full record. By contrast, the SRO – who did not observe witnesses – simply accepted the report at face value, without grappling with contradictory evidence.

The District would say that the SRO was merely "reweighing" the evidence, and that he was entitled to do so.[18] But that's not what happened here. Rather, this scenario is closer to the

---

[12] DE-23.

[13] I-11.

[14] *Id.* (Citing DE110-13, DE115-20, T1142-46).

[15] *Id.* (Rejecting "achieved" grade at DE195). *See* PLMOL at 17-19.

[16] SD-21.

[17] *Id.*

[18] Dist. Br. at 14 ("[A]n SRO can reconsider the weight of the evidence regarding a matter of educational policy and the court must defer to the SRO's determination, which is not a credibility assessment." (Citing *S.F. v. New York City Dep't of Educ.*, No. 11 Civ. 870 (DLC), 2011 WL 5419847, at *45-46 (S.D.N.Y. Nov. 9, 2011)). The District's citation is confusing. *S.F.* does not discuss an SRO's ability to "reconsider the weight of the evidence." Instead, it holds that

4

scenario that the *F.O.* court rejected.  There, the court noted that the "SRO's opinion failed to consider thoroughly or carefully contrary testimony from witnesses present at the IHO hearing, even when that testimony was relied upon by the IHO."[19]  The court stated: "[T]he SRO must actually weigh conflicting evidence before the Court defers to the SRO for weighing conflicting evidence."[20]  It then explained what the SRO *should* do: "The very cases that the SRO cited support the Court's conclusion. In two of the cited cases, **the SRO or the court considered contrary testimony and, before discounting that testimony, gave specific reasons as to why it was not persuasive**."[21]

Here, the SRO ignored the IHO's reasoning about the study skills goal, and never explained why she was wrong to discount the progress report. He never weighed evidence. "[I]t is difficult to imagine how failing to address conflicting evidence could produce a 'well-reasoned' decision."[22]

The same analysis applies to the reading goals: the SRO gave no reasons for rejecting the IHO's analysis.  The IHO analyzed these goals and found them vague, lacking in baselines, and not reliably measurable.[23]  As noted in Parents' opening, the SRO's entire discussion of all three reading goals is confined to one sentence.[24]  He never engaged the IHO's reasoning.  Again - he just listed the goals and then summarily concluded that they met R.H.'s needs.[25] As the *M.H.* court

---

the SRO can make a legal judgment without it becoming an improper credibility determination.  2011 WL 5419847, at *15.

[19] *F.O.,* 976 F. Supp. 2d at 513.

[20] *Id.* at 514 n.9.

[21] *Id.* at 515 (emphasis added).

[22] *L.R. v. City Sch. Dist. of N.Y.C.*, 193 F. Supp. 3d 209, 216 (S.D.N.Y. 2016) (quoting *F.O.*, 976 F. Supp. 2d at 515).

[23] I-11.

[24] PLMOL at 20-21.

[25] SD-20.

and others have held, the Court need not defer to such "conclusory" holdings.[26]

As explained in Parents' opening, the SRO treated the remaining goals with similar inattention to detail.[27] Nor did he do a "cumulative" analysis of the District's procedural violations, having dismissed all of them. And throughout his discussion of the procedural issues, the SRO exhibited a "stubborn reliance" on District witnesses and evidence – largely to the exclusion of evidence supporting Parents and R.H. – that showed his decision to be neither thorough nor well-reasoned. How *does* one "reason" without connecting or weighing competing thoughts?

## 2. The SRO's selective use of the record undermines his finding that R.H. did not need a functional behavior assessment (FBA).

The District argues that the Court should defer to the SRO's finding that its failure to do an FBA or provide a behavior intervention plan (BIP) was not a serious procedural violation of the IDEA.[28]  But, despite taking up several pages of his decision, the SRO's analysis on this issue was not thorough or careful.[29] As with his discussion of IEP goals, the SRO pointed to testimony that advanced the District's position and ignored more persuasive evidence and testimony that credibly undermined it.

For example, the SRO pointed to testimony from Occupational Therapist AnnMarie Boles that, while R.H. needed prompting and redirection, she responded well to them and did not need "hand over hand" support.[30]  By his characterization, Boles downplayed R.H.'s need for redirection.[31] But the full record of Boles's testimony suggests a more serious issue. *Immediately* before the "hand over hand" quote, in testimony the SRO inexplicably omitted, Boles testified:

---

[26] *M.H.*, 685 F.3d at 249 ("The SRO failed to point to contrary evidence that he deemed more compelling. Had he done so, the district court might have properly deferred to the SRO's analysis of the IEP's goals and objectives. But the SRO's conclusory statement does not evince thorough and well-reasoned analysis that would require deference.").
[27] PLMOL at 21-24.
[28] Dist. Br. at 26-28.
[29] *See* PLMOL at 14-15.
[30] SD-24 (citing T354-55, 462-63).
[31] SD-24.

"Q. She also needed a lot of one-on-one attention, right, throughout the school day? A. She definitely needed prompting and redirection, yes."[32]  He also omitted the following direct testimony from Boles – which appears to have surprised the District's counsel:

> Q. Okay. Now, does the parent express or parents express any concerns to you during the course of the 2021-2022 school year regarding R.H.'s needs in this area?
>
> A. Nothing in particular but, you know, all parents have, you know, concerns and needs, but nothing that was – nothing that stands out, no, nothing. I think Mom was in agreement with the OT plan.
>
> Q. Now, did you have any concerns about R.H. in this particular area during the course of the school year?
>
> A. Well, we're always concerned about our students, of course. And with R.H., you know, *the only [thing] that really concerned me was her, you know, she did need a lot of prompting, a lot of redirection, a lot of refocus*. And, you know, of course, I'm always concerned about my students.
>
> Q. Right. Not a fair question, right?[33]

While Boles first said that "nothing stands out" about R.H., when asked an open ended question, she confirmed her serious concerns – "really concerned me" – specific to R.H.  Given that the SRO was selecting portions of her testimony beyond what the parties had cited, he had an obligation to present a complete, balanced picture of that testimony.[34] Instead, he presented an incomplete, imbalanced selection of excerpts, resulting in a misleading narrative that Boles (and others) did not believe R.H.'s inattention and distraction were a serious problem. This was not even arguably an exercise of educational expertise to which the Court owes deference.

---

[32] T462:20-24.

[33] T426:10-427:7 (emphasis added).

[34] He also omitted that Boles was pulling R.H. to work with her in a 2:1 setting, which would reduce her behaviors in comparison with a 12:1 classroom. T255:12-20,  357:2-11.  District BCBA Elyssa Mayer testified agreed that "even under the 1 on 1 clinical conditions of [her] testing, R.H. demonstrated significant difficulty maintaining focus and attention."  T607:19-24.

The SRO's selection of evidence supporting the District's position, while omitting evidence that undercut its position, is more confounding when considering that the District did not provide these excerpts in its request for review.  For example, the "hand over hand" quote discussed above appears nowhere in the District's briefing.

By contrast, Parents repeatedly pointed the SRO to specific testimony – all from District witnesses – that showed the severity of R.H.'s behavioral deficits, but the SRO ignored it. For example, Parents quoted Teresa Moore, R.H.'s 2nd and 3rd grade teacher, who testified that R.H. was distractable to the point she would lose her place in the middle of a task and had a very difficult time with attention and focus.[35]  But rather than address Parents' point, the SRO, without District prompting, quoted a sentence from Moore on the same page as evidence of R.H.'s behavioral progress.[36]

Parents quoted Bridget Karis, the District's Director of Pupil Services, who testified that, based on input from R.H.'s fourth grade teacher, R.H.'s progress "was very dependent upon her attention and that she needed frequent prompts and refocus in order to stay on focus."[37] The SRO ignored this testimony.

Parents quoted District psychologist Jennifer Connell, who said repeatedly that, when she pushed in to R.H.'s classroom, R.H. needed frequent redirection either from her or from the other adults in the room.[38] The SRO ignored this testimony.

Parents quoted District Board Certified Behavior Analyst (BCBA) Elyssa Mayer, who testified that RH's inattention and rushing were behaviors that impeded her learning,[39] that she

---

[35] P88 (Parents' MOL in Opp. to RFR) (citing T71, T75).
[36] SD-24 (citing T75).
[37] P88 (citing T257)
[38] P89 (citing T333-35); T32, T36.
[39] P87 (citing T619-20).

visibly presented with numerous, significant academic needs, and that even under the 1:1 clinical conditions of her testing, she demonstrated significant difficulty maintaining focus and attention.[40] Mayer also explained that RH's working memory and processing speed deficits were areas of more significant need that were also highly sensitive to inattention, visual motor deficits, and her ability to mentally intake and manipulate information. The SRO ignored Parents' citations to Mayer's testimony.

The SRO's practice of selective quotation supports two connected points: (1) His finding excusing the District's decision not to administer an FBA was improperly based on his own limited and imbalanced selections from the record. He "stubbornly" favored the District's position, while ignoring contrary testimony – even from the same District witnesses he cited – that weakened that position. This practice was inimical to the type of thorough and well-reasoned finding that merits the Court's deference. (2) The evidence in the record, viewed as a whole, supports the IHO's finding that the District acknowledged that R.H. had serious interfering behaviors, and it should therefore have administered an FBA and created a BIP. As Parents explained in their opening, these omissions were serious procedural violations that the SRO should have considered individually and cumulatively along with the District's other procedural violations.[41]

### 3. The SRO erred in finding that the District's IEPs were substantively appropriate. The District never proved that it provided R.H. intensive reading instruction.

The District argues at the outset of its brief that the SRO applied the correct, "meaningful benefit" substantive standard, discussed above. But rather than cite specific passages, the District cites the whole SRO opinion.[42] Unfortunately, despite its length, the opinion lacks substantive analysis. The first 22 pages cite the background of the case and address the District's procedural

---

[40] P89 (citing T602-03, 607).
[41] PLMOL at 14-15,
[42] Dist. Br. at 13 (citing SD-1-34).

violations.[43] As noted above, in an exercise of *non-analysis* that federal courts have rejected, the SRO *listed* the IEP goals and declared them appropriate rather than explain *how* they were appropriate. He also cited the record selectively, ignoring evidence cited by Parents to find that R.H. was not in need of an FBA or BIP.[44]  Throughout the section on procedural violations, the SRO did not mention R.H.'s IEPs offering her a "meaningful benefit."

Only on page 27 did the SRO actually turn to the substantive part of R.H.'s IEPs, discussing reading instruction.[45] The first two pages of the section discuss how New York defines "specially designed reading instruction," the Second Circuit's standard for evaluating the appropriateness of instruction, and whether a specific methodology can or should be written into an IEP.[46]

As explained in Parents' opening, the SRO again selectively cited evidence in the record that supported the District's position, while ignoring contrary evidence.[47]  He also embellished upon generic New York standards to infer, after the fact, that the District had offered R.H. proper, individualized reading instruction.[48] Specifically, he cited New York law and state guidance:

> State regulation defines "specially designed reading instruction" as "specially designed individualized or group instruction *or* special services or programs, as defined in subdivision 2 of section 4401 of the Education Law, in the area of reading ... which is provided to a student with a disability who has significant reading difficulties that cannot be met through general reading programs."

> Education Law § 4401(2), in turn, sets [forth] definitions of "[s]pecial services or programs," which includes, among other things, special classes, resource rooms, consultant teacher services, and related services.

> Consistent with the reference to the various special services or programs included in the definition of special education under State Law, State guidance notes that

---

[43] SD-1-22. Parents' opening brief addressed procedural violations at length.
[44] SD-22-24. Parents opening brief addressed the SRO's analysis of R.H.'s behaviors.
[45] The SRO's organization is vexing.  "Reading Instruction" is the fifth section in section VI(B), which groups the May 2021, May 2022 and August 2022 IEPs together. SD-18. The SRO never clearly explains when he is making a procedural finding or a substantive finding, either before or within that large section. The unusual structure makes it difficult even to explain the SRO's holdings.
[46] SD-27-29.
[47] PLMOL at 25-28.
[48] *Id*. at 27-28.

specialized reading instruction could be recommended in the IEP of the student as a special class, direct consultant teacher service, related service, resource room program.[49]

As an initial matter, the District never cited these regulations or guidance materials in its IHO closing brief or in its appeal to the SRO.[50] Thus, as with his search for hearing testimony favorable to the District, discussed above, the SRO was, at least in appearance, making an argument in the District's favor that the District did not advance. Parents had no ability (until this litigation) to respond to the SRO's legal argument on behalf of the District.

Unfairness aside, the SRO's proposed standard for an IEP to specify a child's individualized reading instruction is devoid of academic content. He mentioned individual and group instruction, special classes, resource rooms, consultant teacher services, and related services.[51] But these are all placements and services, not programs.

Next, he noted that, under Second Circuit precedent, an IEP typically does not have to specify a particular reading methodology, so long as the methodologies "referenced in the student's IEP are appropriate to the student's needs."[52]

When the SRO finally turned to R.H.'s actual IEPs and applied his non-specific standard, he demonstrated how easy it is to meet. He noted with approval that the 2021 CSE recommended "specific reading instruction."[53] But he never explained how this generic term could represent programming that was individualized for R.H.'s unique and significant needs.

---

[49] SD-28 (citing "Questions and Answers on Individualized Education Program (IEP) Development, The State's Model IEP Form and Related Requirements," at 31, Office of Special Educ. Mem. [Updated Oct. 2023], available at https://www.nysed.gov/sites/default/files/programs/specialeducation/questions-answers-iep-development_0.pdf)) (spacing added); (8 NYCRR 200.6[b][6]).
[50] *See* S75-106 (IHO closing brief); P15-47 (District MOL in support of Request for Review).
[51] SD-28.
[52] *Id*. (Citing *R.B. v. N.Y.C. Dep't of Educ*., 589 Fed. Appx 81, 86 (2d Cir. 2013)).
[53] *Id*.

He then noted that the CSE recommended a 12:1:1 classroom, which is an appropriate venue for "specialized reading instruction."[54] But he did not say how it was appropriate for R.H. or why he felt comfortable ignoring Parent's evidence to the exact contrary. He listed R.H.'s three reading goals, again without stating that or explaining how they were appropriate for her. And he mentioned that a speech language pathologist was assigned to her, who would work towards her reading goals. Nothing in this discussion shows that the District had *any* methodology for teaching R.H. to read. Under the SRO's reasoning, R.H.'s IEPs would adequately describe the reading instruction for any New York child who needs "specialized reading instruction." This result flouts *Endrew F's* command that an IEP be "tailored to the unique needs of a particular child" or "specially designed to meet a child's unique needs."[55]

Having cited this generic procedural reading guidance, the SRO disregarded a far more specific and substantive New York Q&A document for struggling readers: the August 2018 Q&A for "Students with Disabilities Resulting from Dyslexia, Dysgraphia and Dyscalculia" (Dyslexia Q&A).[56] This Q&A, cited at least 10 other times by SROs, gives specific guidance about IEPs for language based learning disabilities. Consistent with *Endrew F.*, it states, in relevant part: "The specially designed instruction provided to each student should be based on the information documented in the present levels of performance and tailored to his or her individual, disability-related needs."[57]

---

[54] *Id*. at 29.

[55] *Endrew F.*, 580 U.S. at 400-01.

[56] *See* New York Dyslexia Q&A, attached as Ex. B to the Complaint. SRO Steven Krolak relied on the New York Dyslexia Q&A just two weeks earlier on September 18, 2024. *See* SRO No. 24-351, https://www.sro.nysed.gov/decision/2024/24-351 (visited Jan. 4, 2025). The Document is referenced in at least 10 SRO decisions: 24-150, 14-154, 21-171, 20-015, 22-098, 21-233, 22-092, 22-097. 20-073, 18-083. Dr. McDonough diagnosed R.H. as having a language-based learning disability, requiring an evidence-based, multi-sensory reading curriculum used for children with dyslexia. PE54; S10.

[57] *Id*. at 6.

The Dyslexia Q&A continues, echoing the IHO's own language: "When discussing a student's present levels of performance, the CSE should review what prior instructional methods and strategies have been utilized with the student to avoid reinstituting programs that have not proven effective in the past."[58]

Discussing how such programs should be delivered, it states: "Specially designed instruction must be provided with appropriate frequency, duration, and instructional grouping specific to the student's individual, disability-related needs."[59]

The Dyslexia Q&A goes on to explain that effective instruction should be ***explicit and systematic***. This means that information is presented in a clear and straightforward way, and the student is provided with step-by-step examples during each lesson.

Discussing the competencies reading programs should address, it states:

Specially designed instruction for students with dyslexia should incorporate and build on the overall domains of effective reading instruction (i.e., ***phonological/phonemic awareness, phonics, comprehension, fluency, and vocabulary***).

Specially designed instruction for students with dyslexia should, however, ***explicitly and systematically target*** the specific reading skills with which the student demonstrates difficulty.[60]

Ignoring *this* specific guidance, the SRO excused the District's failure to meet New York standards in both form and content:

- He did not make the District specify or offer instruction for R.H. based on her IEP's present levels of performance (which were vague and inaccurate in any event) and tailored to her individual, disability-related needs (which the District had never established).

- He did not make it identify or state what prior instructional methods and strategies were used with R.H. to avoid reinstituting programs that had not proven effective in the past.

---

[58] *Id.*; I-20.
[59] *Id.*
[60] *Id.* (Emphases and paragraph spacing added).

- He did not require that its IEPs state anything about the frequency, duration, and instructional grouping specific to the R.H.'s individualized, disability-related needs.

- He did not hold it to the obligation to offer "explicit and systematic" programming.

- He did not make it provide R.H. with scaffolded, multisensory learning.

- He did not make the District incorporate and build on the overall domains of effective reading instruction (i.e., phonological/phonemic awareness, phonics, comprehension, fluency, and vocabulary).

- He did not make the District provide Parents with coherent, meaningful progress tracking documentation at regularly specified intervals.

Instead, the SRO found that the District's bare assertion that it would provide "specific reading instruction" in a "12:1+1 special class" was adequate short-hand for all of these components.

The SRO cited the District's use of "Wilson methodology."[61] However, the District produced little evidence that it used this program; in fact, fourth grade teacher, Laura Reetz, testified that she could not find where her Wilson records were stored.[62] Reetz was not certified to teach Wilson and conceded that she did not provide the program with fidelity.[63] Neither District reading teacher was certified to teach the Wilson program.[64]

Dr. Erin McDonough gave unrebutted testimony that Wilson requires certification:

[I]f you're using an evidence-based program such as Wilson, even Wilson the way that it was developed was developed to be administered in a group of six or less students and that depends on the level of certification of the provider. So a Level One Wilson certified provider is only supposed to deliver Wilson individually whereas a Level 2 provider can deliver the intervention in a group of six or more students.[65]

---

[61] SD-29.
[62] T843:10-24.
[63] T830:20-831:20.
[64] T904:3-4 (reading teacher Edie Stein); T1180:22-24 (reading teacher Melissa Luciere). The SRO has held that Wilson certification is not a requirement under New York law. *See* SRO 23-209. Regardless of whether the SRO is correct to disregard the Wilson publisher's requirements, the teachers' lack of Wilson certification in this case is a to be considered in assessing whether the District's overall reading program was appropriately intensive for R.H.
[65] T1607:8-18.

After discussing the eclectic reading program the District offered to R.H., the SRO reverted to *listing* R.H.'s supposed achievements in reading, citing at face value CSE meeting comments and progress reports.[66]  But even if these meeting comments and progress reports were accurate, he never said that or explained how the progress reported was meaningful or appropriate.

He also completely ignored the IHO's serious charge that the District inflated R.H.'s reading probe scores by repeating her testing (*i.e.*, that they lacked credibility). She wrote:

> [F]or 3rd (2020-2021) it appears the assessments came more frequently at the end of the year as a strategy to get the level up; likewise, for the 4th grade (2021-2022) the reading levels could not be ascertained at the beginning of the year until after 3 assessments in September and again at the end of the year, during May 2022 -3 assessments were given days within a 6 day period that appears again to get the level up.[67]

Although the SRO referenced this page of the IHO's decision, he only noted her concern about R.H.'s fluctuating scores, omitting her observation that the District appeared to be inflating the results of R.H.'s reading probes.[68]  The IHO's observation, made after sitting through the entire hearing, supported a finding that the District's CSE meeting comments and its progress reports were unreliable at best. Regardless of whether the SRO agreed with the IHO's interpretation of the evidence, he had to grapple with it, and not simply accept at face value the evidence she rejected.[69] Inexplicably overturning credibility findings and ignoring evidence that challenges the integrity of the District's record-keeping are not educational decisions to which the Court owes deference.

### 4. The SRO erred in holding that the District's OT interventions were sufficient to meet R.H.'s vision-related needs.

The IHO agreed with Parents' expert, developmental optometrist Dr. Michelle Bessler, that

---

[66] SD-29-30.
[67] I-16 (citing DE194-200).
[68] SD-6 (citing I-16).
[69] *C.L. v. N.Y.C. Dep't of Educ.,* 2013 WL 93361, *7 (S.D.N.Y. Jan. 3. 2013).

R.H.'s developmental vision issues were interfering with her reading, math and writing, and that her vision therapy sessions were educationally necessary.[70]

The SRO rejected the IHO's finding, recharacterizing Dr. Bessler's interventions as "a medical issue that ***the IHO concedes*** was developmental in nature which needed to be addressed by a medical professional in a doctor's office."[71]  The inartful statement that the IHO "concedes" a factual point implies that the SRO was in an adversarial relationship with the IHO.  In fact, he took the sentence *verbatim* from the District's appeal and brief:

> The Student was receiving vision therapy vis a vis the parent to correct ocular deficits, ***a medical issue that the IHO concedes is developmental in nature*** (Dec. at 25), and that needed to be addressed by a medical professional in a doctor's office. With respect to any visual-motor deficits the Student had that were indeed impacting her education, those were identified by the Committee and addressed through her IEP and related services.[72]

Several parts of SRO's section on vision services are pasted from the District's appellate papers, sometimes with subtle changes to the language. Here are just three examples:

**1. Ocular deficits as a purely medical issue:**

> **District Brief:** "The Student was receiving vision therapy to correct ocular deficits, a medical issue that the IHO concedes is developmental in nature...that needed to be addressed by a medical professional in a doctor's office."[73]

> **SRO:** "[T]he district contends the student was receiving vision therapy...to correct ocular deficits, a medical issue that the IHO concedes was developmental in nature which needed to be addressed by a medical professional in a doctor's office."[74]

**2. Visual-Motor deficits identified in IEP:**

---

[70] I-25. Parent notes that the record reflects that District witnesses also conceded that R.H.'s developmental vision issues were interfering with her reading, math and writing.
[71] SD-26.
[72] P10; P44-45 (emphasis added).
[73] P-44-45.
[74] SD-26.

> **District Brief:** "With respect to visual-motor deficits the Student had that were indeed impacting her education, those were identified by the Committee and addressed through her IEP and related services."[75]
>
> **SRO:** "With respect to any visual-motor deficits the student had that were indeed impacting her education, those were identified by the CSE and addressed through her IEPs."[76]

### 3. Vision therapy as "beneficial" but not "required":

> **District Brief:** "[H]er decision is predicated on testimony that vision therapy was improving her overall visual performance and therefore beneficial for the student."[77]
>
> **SRO:** "[T]he IHO's decision is predicated on testimony that vision therapy was improving the student's overall visual performance and therefore beneficial for the student."[78]

The SRO's unattributed adoption of language from the District's brief again calls into question whether he read Parents' arguments or the underlying record Parents cited with the same care that he showed to the District.

He did not. Parents answered all of these concerns in their SRO brief, but the SRO did not grapple with their arguments.[79] As Parents explained, Dr. Bessler testified that R.H.'s vision problems were developmental.[80] She testified that she often receives referrals from public schools to address vision issues that glasses cannot correct.[81] And she testified that RH required vision therapy to access her education and make meaningful progress, and that OT and accommodations alone are insufficient to address this area of need.[82]

---

[75] P-45.
[76] SD-26.
[77] P-45.
[78] SD-27.
[79] P83-85.
[80] P-83.
[81] P-84.
[82] P-85 (citing T1241-42, 1262-63, 1284).

Rather than addressing Parents' points, the SRO wrote that "*the IHO* did not grapple with the degree to which the OT services were addressing the student's vision needs."[83] But the IHO was not a party or an opponent. If the IHO's decision failed to address an important point, the SRO *should have looked in the record to see if Parents had grappled with it*.

In fact, Parents did address the degree to which the OT services were addressing the student's vision needs. Dr. Bessler testified:

> Q. Why can't R.H.'s needs in terms of her vision deficits be addressed through occupational therapy or can they?
>
> A. They cannot. The occupational therapists that I speak with and that I know that have had long-term relationships with they do not have the background to be able to address visual needs of patients the way they need to be addressed. Occupational therapists that I speak to they would like to. They want to help these children immensely. Sometimes the occupational therapists are asked to address this by the schools but the OTs that I speak with feel very much like their hands are tied because they have limited knowledge in how to fully address these things. So no, they cannot address these things the way they need to be addressed.[84]

Dr. Bessler then testified how the District's IEPs failed to demonstrate an understanding of or address R.H.'s developmental vision deficits:

> Q. Okay. Well, having reviewed it recently, in your opinion, does Exhibit 16[85] establish what I'll call a vision skills baseline? In other words, where is the student's baseline in terms of her vision skills?
>
> A. No.
>
> Q. Does the report provide any kind of meaningful insight into R.H.'s progress in the area of vision skills?
>
> A. No.
>
> Q. And based on the report, are you able to ascertain at what age level her vision related performance is at?
>
> A. No.

---

[83] SD-25 (emphasis added).
[84] T1241:23-1242:18.
[85] Ex. 16 is the District's March 2021 Occupational Therapy Re-Evaluation, DE139-42.

Q. Do you see any recommendations addressing R.H.'s developmental vision deficits within this report?

A. No.[86]

Addressing IEP goals, Bessler testified:

Q. Okay. So in reviewing these goals, Doctor, do you see goals here that in your view are addressing the visual deficits that you observed with R.H.?

A. No.

Q. So similar question, Dr. Bessler, what, if any, vision related [goals] do you see in this IEP?

A. I don't see anything specific to the vision. In other words, she says that the visual motor skills are improved. That's an integrative task so you're asking the visual system and the motor system to work together but that's not a specific visual goal.[87]

Q. R.H.'s district appointed occupational therapist Ms. Boles. She testified earlier in these proceedings and in sum that she had observed R.H. to have difficulties scanning, tracking, finding information on a page, finding letters with body and spacial awareness in the hallways and the classroom with crowd negotiation, with making eye contact, and stopping and looking, copying designs, interpreting building or copying 3D images, visual discrimination and with puzzles. My question to you, Doctor, are these the type of deficits that you address in your field of work?

A. Yes, I do.

Q. Are these the types of deficits that in your view can be addressed through occupational therapy alone?

A. No.[88]

The SRO totally ignored this extensive testimony, even though it directly addressed his concern that "the IHO did not grapple with the degree to which the OT services were addressing the student's vision needs." As the SRO knew, Parents had no control over what points the IHO

---

[86] T1248:5-23.
[87] T1254:3-1255:4.
[88] T1262:22-1263:17.

would specifically include in her opinion.  To be fair to both parties, he had an obligation to do the same searching review of the record for Parents that he did for the District.

The District argues now that "[t]here is no requirement that an SRO give more weight to expert testimony than to that of fact witnesses."[89]  But, as the *F.O.* court stated: "[T]he SRO must actually weigh conflicting evidence before the Court defers to the SRO for weighing conflicting evidence."[90]  Here, the SRO didn't weigh anything.  Rather than grapple with Dr. Bessler's unrebutted expert testimony, he just contradicted her: "While it may be true that the student benefited from vision therapy, that does not mean that the service was required to enable the student to receive educational benefit."[91]  The Court need not defer to the SRO's holding with respect to vision services, which, having ignored contrary evidence, was not thorough or well-reasoned.

### IV. CONCLUSION

Wherefore, for the reasons stated here and in Parents' opening brief, Parents respectfully ask the Court to Deny the District's Motion for Judgment on the Administrative Record.

Dated: February 20, 2026

Respectfully submitted,

Richard F. Corrao
**Law Office of Susan J. Deedy & Associates**
1600 Stewart Avenue, Suite 609
Westbury, New York 11590
(516) 221-8133
Rcorrao@Susandeedylaw.com

Benjamin J. Hinerfeld
**Law Office of Benjamin J. Hinerfeld**
9 Stoddard Street
Plymouth, MA 02360

1528 Walnut Street, Suite 1100
Philadelphia, PA 19102

447 Broadway 2nd Floor
New York, NY 10013

Ben@hinerfeldlaw.com

---

[89] Dist. Br. at 31 (citing *L.J.B. v. N. Rockland Cent. Sch. Dist.*, 660 F. Supp. 3d 235, 260 (S.D.N.Y. 2023).
[90] *Id.* at 514 n.9.
[91] SD-27.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____X

**T.H. and E.H.** individually, and on behalf of their child,
R.H., a minor,

Plaintiffs,

     -against-

**West Hempstead Union Free School District**

Defendant.
_____X

Case No. 2:25-150-NJC-JMW

Individuals with Disabilities
Education Act;
N.Y. Educ. Law § 4401 _et seq_.

## CERTIFICATE OF SERVICE

    I, Benjamin J. Hinerfeld, certify that on February 20, 2026, served _via electronic mail_ the

above Memorandum of Law in Opposition to Defendant's Motion for Judgment on the

Administrative Record, on John Sheahan, Esq., counsel for Defendant, West Hempstead Union

Free School District.

Dated: February 20, 2026
Plymouth, Massachusetts

/s/ Benjamin J. Hinerfeld
Benjamin J. Hinerfeld
**LAW OFFICE OF BENJAMIN J. HINERFELD**
Attorneys for Plaintiffs
9 Stoddard Street
    Plymouth, MA 02360
1528 Walnut Street,  Suite 1100
    Philadelphia, PA 19102
447 Broadway 2nd Floor
    New York, NY 10013
Office (508) 591-0385
Cell (215) 694-7432
Fax (215) 689-2423
Ben@hinerfeldlaw.com